**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

STEPHEN MCELLIGOTT,

    Petitioner,

    v.

AUDREY MCELLIGOTT,

    Respondent.

Civil Action No. 23-3175 (RK) (RLS)

**<u>OPINION</u>**

**<u>KIRSCH, District Judge</u>**

**THIS MATTER** comes before the Court upon the Petition by Stephen McElligott ("Petitioner") for the return of his minor child C.M., whom Plaintiff seeks to return to Ireland pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), implemented through the International Child Abduction Remedies Act, 22 U.S.C. § 9001, *et seq.* (Petition, ECF No. 1.)

Petitioner Stephen McElligott, 39 years old, was born in Ireland and is an Irish citizen. (Stip. ¶¶ 5–6.)[1] Respondent Audrey McElligott (nee Mocco) ("Respondent"), 44 years old, was born in New York and is an American citizen. (*Id.* ¶¶ 7–8.) The parties were married on November 10, 2009 in Ireland where they lived together until November 14, 2022. (*Id.* ¶ 9; Pet. ¶ 6.) The parties' older son, C.M., was born in Ireland on April 9, 2011 and lived in the family home in Ireland with both parents until November 14, 2022. (Stip. ¶¶ 10, 12.) C.M. is a citizen of Ireland.

---

[1] The parties submitted Joint Stipulations to the Court at the final pre-trial conference on August 18, 2023. Inadvertently, neither party moved the Joint Stipulations into evidence during the proceedings on August 21 and 22, 2023. After confirming the parties' consent, the Court received the Joint Stipulations in evidence on August 30, 2023. (ECF No. 40.)

(*Id.* ¶ 13.) J.M., a second son, was born in Ireland on March 19, 2013, and lived in the family home in Ireland with both parents and his older brother, C.M. (*Id.* ¶ 11.) Petitioner alleges that Respondent wrongfully removed C.M. from his habitual residence in Ireland and/or is wrongfully retaining him in the United States.[2]

The Court finds that Petitioner has established a *prima facie* showing of wrongful removal and/or retention under the Hague Convention. Furthermore, the Court declines to exercise its discretion and denies the Petition based on the wishes of the child affirmative defense, because the Court finds that C.M.'s opposition to returning to Ireland results from undue influence, both intended and unintended, from his residence with Respondent's family in New Jersey for the past nine months. For the following reasons, the Petition (ECF No. 1) is **GRANTED** and Respondent is **ORDERED** to return C.M. to Ireland.

## I.   **FINDINGS OF FACT**

This decision chronicles the heartrending, regrettable facts of family heartache and turmoil, which have thrust two young children into its morass. At the outset, it bears noting that there is much which this case is *not*: (1) this Court is *not* authorized to undertake a child custody determination in a marriage dissolution proceeding under N.J. Stat. Ann. § 9:2-4; (2) this Court is *not* authorized to determine whether any party was the victim or perpetrator of domestic violence pursuant to the New Jersey Prevention of Domestic Violence Act of 1991, N.J. Stat. Ann. § 2C:25-17 and *Silver v. Silver*, 903 A.2d 446 (N.J. Super. Ct. App. Div. 2006); (3) this Court is *not* authorized to determine whether any party abused or neglected C.M. pursuant to N.J. Stat. Ann.

---

[2] As set forth in greater detail below, although C.M. and J.M. both travelled with Respondent to the United States in November 2022, in January 2023 J.M. was subsequently returned to Ireland to live with Petitioner. Thus, the subject Petition involves only C.M.

§ 9:6-3; and (4) this Court is *not* authorized to undertake an "best interests of the child" analysis in a termination of parental rights case pursuant to N.J. Stat. Ann. § 30:4C-15.1.

The subject petition presents a discrete factual and legal issue circumscribed by the Hague Convention; that is, whether C.M. shall return to Ireland, where he was born and raised, as Petitioner seeks, or whether he may remain in the United States, as per Respondent.

### A.    PROCEDURAL HISTORY

On June 9, 2023, Petitioner filed the instant Petition seeking C.M.'s return to Ireland. (ECF No. 1.)[3] On June 30, 2023, Respondent filed an answer to the Petition. (ECF No. 8.) At a show cause hearing held on July 19, 2023, the Court entered a temporary restraining order enjoining Respondent from removing C.M. from the jurisdiction pending a decision on the Petition. (ECF No. 13.) The Court set a date for a bench trial on the Petition and entered a pre-trial schedule. (ECF Nos. 13, 18.)

On July 12, 2023, Respondent filed a motion seeking (1) appointment of a guardian *ad litem* for C.M. and (2) for the Court to conduct an *in camera* interview of C.M. (ECF No. 11.) The Court agreed to interview C.M. *in camera* the week before trial (ECF No. 13) and denied Respondent's motion for appointment of a guardian *ad litem* (ECF No. 20.) The Court denied Respondent's request for the attorneys to be present at the *in camera* interview in order to "best . . . determine the applicability of the mature child defense." (ECF No. 30.) On August 14, 2023, the parties separately submitted proposed questions for the Court to ask C.M. during the interview, and the following day the Court conducted an approximately thirty-five-minute *in camera* interview with C.M. (ECF No. 33.) The parties each submitted pre-trial memoranda. (ECF Nos. 35, 37.) On August 21 and August 22, 2023, the Court conducted a two-day bench trial. Petitioner

---

[3] The Court has jurisdiction over this proceeding pursuant to 22 U.S.C. § 9003(a).

was represented by a *pro bono* attorney from the Rutgers Law Associates. Respondent was represented by two partners from the law firm Greenbaum, Rowe, Smith & Davis LLP.[4]

Each party called four witnesses. Petitioner presented three fact witnesses, who each testified remotely via video link from Ireland: Petitioner himself, his father Martin McElligott ("Mr. McElligott"), and his sister June McElligott McCabe ("Ms. McCabe"). Respondent also called three fact witnesses: Respondent herself, her father Peter Mocco ("Mr. Mocco"), and her mother Lorraine Mocco ("Mrs. Mocco"). Each party also presented the testimony of their own expert child psychologist, who rendered opinions on C.M.'s maturity, his reasons for wanting to remain in the United States, and whether his reasons were the product of undue influence. Petitioner called Dr. Melissa M. D. Lane, and Respondent presented testimony from Dr. Sharon Ryan Montgomery.[5] The Court sustained Petitioner's objection to C.M. testifying at trial. (Tr. at 496:11–499:25); *see J.C.C. v. L.C.*, No. 20-3289, 2022 WL 985873, at *2 (3d Cir. Mar. 31, 2022) (affirming trial court's decision to not permit child to testify at trial during Hague Convention proceeding).

## B.   CREDIBILITY DETERMINATIONS

The Court's findings of fact, and its application of its factual findings to the legal questions presented in the Petition, correlate to its opportunity to interview C.M. in person in Chambers and

---

[4] Citations to the transcript of the proceedings on August 21 and 22, 2023 are to "Tr." Citations only include the name of the witness testifying at that portion of the proceeding where the preceding sentence does not indicate the witness.

Citations to the transcript of the Court's August 15, 2023 *in camera* interview with C.M. are to "C.M. Tr." The Court ordered that the interview transcript be made part of the record, made available to the parties after the close of evidence in order to protect the integrity of the trial testimony. (ECF No. 30.) In fact, at the close of the evidentiary phase, a transcript of the *in camera* child interview was provided.

[5] Because the Petition was heard as a bench action without a jury, and with the parties' consent, the Court admitted the expert reports of each party. (Tr. at 14:2–13; 311:1–3); *see also Bds. of Trustees of Int'l Union of Operating Engineers Loc. 825 Welfare Fund v. Delaware Valley Crane Rental, Inc.*, No. 17-8567, 2023 WL 3965914, at *3 (D.N.J. June 13, 2023). Dr. Lane's expert report was admitted as Exhibit P-12. Dr. Montgomery's expert report was admitted as Exhibit R-1.

hear live testimony from eight additional witnesses, four in person and four via simultaneous video link. The Court has conducted an "individualized assessment of the credibility of each witness" and made factual findings as a result. *Sasson v. Sasson*, 327 F. Supp. 2d 489, 490 n.2 (D.N.J. 2004). The Court's credibility assessments are made in consideration of "how well each witness was able to recall and describe the things testified to, the manner of the witness while testifying, whether the witness had an interest in the outcome of the case or any bias or prejudice concerning any party or matter involved in the case, how reasonable the witness' testimony was considered in light of all the evidence in the case." *Id.* (citing 9A Wright & Miller, Federal Practice and Procedure: Civil 2d § 2585 (1995)); *see also Silvestri v. Oliva*, 403 F. Supp. 2d 378, 380 (D.N.J. 2005); *Stone v. Stone*, No. 19-17962, 2019 WL 6790500, at *1 n.1 (D.N.J. Dec. 12, 2019).

The Court, having observed each of the testifying witnesses in court or live via video, makes the following findings. Of course, the Court is mindful of the emotions and partisan alignment which underlie each person's testimony. Notwithstanding, in the Court's view, each of the six testifying fact witnesses appeared candid and forthright and, thus, the Court largely credits their testimony.

The testimony of Mr. McElligott and Ms. McCabe corroborated each other, as well as significant areas of Petitioner's testimony. Both witnesses also had the benefit of providing their observations of C.M. and the rest of the family while in Ireland, albeit Ms. McCabe was more limited in her interactions with the family due to a period of estrangement from her brother. In addition, both viewed C.M. via video phone calls with Petitioner from the United States. The Court found both to be earnest and neither exhibited an animus against Respondent.

Similarly, the Court found both Mr. and Mrs. Mocco to have testified honestly. Their loyalty to their daughter, the Respondent, was quite clear. Their longstanding, serious misgivings

about her relationship with Petitioner, and their dislike for him, was unmasked and palpable. They acknowledged same with no attempted sanitization. Each acknowledged unflattering discussions about and/or characterizations of Petitioner, and that no effort was made to refrain from doing so in C.M.'s presence.

The Court found the testimony of Petitioner to be largely believable.[6] He readily admitted to certain facts which were unflattering to him and which would have been difficult to establish conclusively, absent his concession. For example, with no hesitation, he admitted that he was verbally cruel to Respondent on occasions and did not contest specific awful and unkind name-calling and mocking of her. In the Court's view, he appeared to have an inflated sense of himself and his attributes while having a limited ability, if any, to self-examine and take meaningful responsibility for or reflect upon the state of his marriage and the child-rearing decisions of both of their children. It appeared that his rigidity and short fuse brought about interpersonal verbal conflict with others. His suspicion, however, in Respondent's traveling to the U.S. and her family in general was legitimate and for good reason: she pre-planned to remain in the U.S. with her children without his consent and her parents loathed him.

### C.   THE PARTIES' RELATIONSHIP

Petitioner and Respondent met through a Catholic internet dating site in 2009. (Ex. R-1 at 7.) At that time, Petitioner lived in Dundalk, Ireland, where he lived most of his life, and Respondent lived in Jersey City, New Jersey. (*Id.* at 7; S. McElligott Test., Tr. at 149:1–3.) Respondent acknowledged in an interview to her testifying expert that at that time, in her early 30s, she had limited dating experience and had recently gone through a "Christian conversion,"

---

[6] The testimony of Respondent, as stated herein, was so brief and cursory that it was largely unilluminating, except as noted otherwise herein. In addition, the Court throughout this Opinion has made its credibility findings, in detail, as to C.M., Dr. Lane, and Dr. Montgomery.

which bonded her and Petitioner rather quickly. (Ex. R-1 at 7.) A few months later, according to Respondent, she visited Petitioner and, against her "parents' wishes," she remained in Ireland with Petitioner. (*Id.*) In fact, Respondent's mother, Lorraine Mocco, testified that she and another daughter, Marjorie, traveled to Ireland in the hopes of trying to persuade Respondent to put off their planned wedding allow her new, short-lived romance more time to develop. (Tr. at 458:20–459:2.) For his part, Peter Mocco, Respondent's father, admitted to Respondent's expert that "he was not in favor of Audrey's quick and impulsive marriage to Stephen" and that "he, in fact, did try to persuade her from doing so." (Ex. R-1 at 22.) Their quest was unsuccessful as Petitioner and Respondent married in Ireland on November 10, 2009. (Pet. ¶ 6.) Neither of Respondent's parents attended the wedding because of work and family commitments. (Ex. R-1 at 7; L. Mocco Test., Tr. at 458:7–16.) To date, although clearly estranged and living on different continents, Petitioner and Respondent remain married, (Pet. ¶ 6), and neither indicated an intent to divorce.

It was clear from the testimony and exhibits adduced at trial that Respondent's parents had misgivings about the marriage at the outset, perhaps presciently. One need not be a skilled matchmaker or relationship counselor to know that Petitioner and Respondent came from two very different backgrounds and cultures. Petitioner had what appeared to be a blue-collar upbringing in Ireland. His father, Martin McElligott, now 77 years-old, was born in and continues to live in Dundalk, Ireland. (M. McElligott Test., Tr. at 120:7–22.) Mr. McElligott was a truck driver and his wife, Petitioner's mother, worked in a factory for 30 years. (*Id.* at 121:3–20.) They raised four biological children together, and Mrs. McElligott had a daughter before they married. (*Id.* at 121:21–122:18.) Both are retired. (*Id.* at 121:3–20.)

In contrast, Respondent was raised on what can only be described as a sprawling compound in Bernardsville, New Jersey. Mr. Mocco described the main house as consisting of six bedrooms,

with an additional three suites — each with a bedroom, a bathroom and a sitting room. (M. Mocco Test., Tr. at 425:24–427:8.) The main house has seven bathrooms, and among other things, a nursery for newborns, two laundry rooms, a home theater, and a billiard room. (*Id.* at 427:4–428:2.) There is a separate guest house on the property, where Respondent presently lives with C.M., which has three bedrooms, a bathroom, kitchen, dining room, and living room. (L. Mocco Test., Tr. at 475:22–476:8.) In addition, C.M. himself described another structure which contained a fully equipped gym. (C.M. Tr. at 22:11–25.) The property consists of approximately twenty acres, and in addition to the structures already described, has tennis courts and pastures with sheep and a sole-surviving chicken, down from about 40 in the past. (P. Mocco Test., Tr. at 428:3–23.) In addition, they also used to have horses and cows. (*Id.* at 248:13–15.)

Mr. Mocco, 81 years old, still works full-time overseeing a vast portfolio of businesses and entrepreneurial ventures. (*Id.* at 444:21–23, 453:14–454:10.) After graduating law school and working in the public sector, he owned and operated his own real estate firm developing large tracts of land, and owns a number of companies, "from healthcare to restaurants to office buildings to apartment buildings." (*Id.* at 453:19–454:10.) C.M. remarked in an interview with Dr. Lane, in reference to his grandfather's financial success, that "he owns half of Jersey City." (Ex. P-12 at 21.)

Mrs. Mocco, for her part, was an elementary school teacher for well more than a decade, and has served as an administrator at a nursing home and assisted living facilities. (L. Mocco Test., Tr. at 457:5–13.) She recently obtained a master's degree and, at present, is a part-time art teacher. (*Id.*) The Moccos raised seven children, most of whom live now in New Jersey or New York, with an emphasis on education. (*Id.* at 457:14–25; C.M. Tr. at 5:20–7:21.) C.M.'s remark to Dr. Lane

that all seven attended Ivy League schools, albeit apparently somewhat embellished, confirmed same. (Ex. P-12 at 22; P. Mocco Test., Tr. at 405:17–23, 446:9–12.)

Respondent attended the prestigious and highly competitive Georgetown University. (A. McElligott Test., Tr. at 505:15–17.) Petitioner obtained a Junior Certificate in Ireland, which is a pre-high school graduation degree, concluding his academics at age fifteen. (S. McElligott Test., Tr. at 385:11–386:25.) Except for brief periods of time over the thirteen years residing together in Ireland, neither Petitioner nor Respondent worked out of the home. (*Id.* at 232:11–233:7.) They lived in "social housing," with "very low rent" and lived off of financial assistance from the state, as well as monthly and other financial support from Respondent's parents. (*Id.* at 150:18–21, 233:8–13, 350:3–352:2; P. Mocco Test., 417:15–20.)

## D. RESPONDENT'S MEDICAL HISTORY

A decade or so before meeting Petitioner, in or around 1999, while a college student at Georgetown, Respondent was diagnosed with bipolar disorder. (A. McElligott Test., Tr. at 505:15–17; Ex. R-1 at 7.) According to Respondent, prior to her marriage, she went through periods where she stopped taking the prescribed medication due to the side effects, prompting relapse. (*Id.*) She reported that she was initially stable after she moved to Ireland, but had to discontinue her medication upon her pregnancy with C.M. (*Id.*) In its stead, she was prescribed Zyprexa for bipolar disorder, which was "less toxic in terms of the pregnancy" but had the side effects of causing high sedation and significant weight gain. (Montgomery Test., Tr. at 282:3–21.) C.M. was born on April 9, 2011. (Stip. ¶ 10.)

In addition, while six months pregnant with the parties' second child, Respondent was diagnosed with Stage 4 Hodgkin's Lymphoma, which required chemotherapy both pre and post childbirth. (Ex. R-1 at 8.) J.M., a boy, was born on March 19, 2013. (Stip. ¶ 11.) Chemotherapy

and radiation were unsuccessful, requiring that Respondent receive a stem cell transplant in 2014. (Ex. R-1 at 8.) It appears, thankfully, that Respondent is in remission.

Throughout and to date, Respondent also suffered from debilitating and frequent migraines, rendering her bedridden at times for days. (S. McElligott Test., Tr. at 384:9–385:2.) Respondent testified before the Court that she continues to take prescribed medications relating to her mental and physical health, including Abilify for bipolar disorder; Topamax for migraines; a sleeping medication; and as needed, Klonopin for anxiety. (Tr. at 504:18–506:6.) She candidly acknowledged, while present for the entirety of the court proceedings, that: "sometimes like I – I lose my focus" and thus at times was not following along. (*Id.* at 506:20–507:7.) She appeared to the Court as a quiet, lovely person, earnest and well-intentioned but quite frail, a bit cloudy, and somewhat anxious. Her exceedingly brief testimony consisted of halting responses to simple, straightforward questions, many of which were leading.

### E.    C.M.'S EDUCATION IN IRELAND

Notwithstanding Respondent's significant and multiple chronic mental and physical health challenges, Petitioner and Respondent decided that the children would be home-schooled in Ireland. The Court finds that this decision, however obviously ill-advised and imprudent, was made jointly by both parents. (Ex. P-12 at 7–8; Ex. R-1 at 8.) In fact, in summarizing her interview with Respondent as memorialized in a report, Dr. Montgomery wrote: "[Respondent] discussed that the children were exclusively home-schooled in Ireland, due to inadequacies of the school system there." (Ex. R-1 at 8.) Petitioner's sister, Ms. McCabe, corroborated that it was Respondent who was the driving force in homeschooling the children: "we thought [homeschooling] was like an American type . . . [Respondent] was adamant she wanted — and she had convinced Stephen and everybody she knew what she was doing when she was homeschooling these children."

(McCabe Test., Tr. at 143:6–13; *see also id.* at 144:22–23 ("Audrey insisted on homeschooling."), 146:1–3.) It is not disputed that Respondent was solely responsible for the homeschooling of the children, and Petitioner openly acknowledged that his limited education, especially in math, impeded his ability to assist in meaningfully providing academic instruction. (S. McElligott Test., Tr. at 219:9–220:1; A. McElligott Test., Tr. at 504:12–17.)

C.M., in his *in camera* interview with the Court, advised that his mom's routine migraines required her "to go up to her room in complete darkness and just shut away for the like the whole day." (C.M. Tr. at 13:8–13.) Thereafter, C.M. expounded on his experience with being homeschooled by stating:

> It never really did [take place]. It just sort of happens like as a one-off thing. Because like I said, my Mom got migraines. I couldn't really get schooled by her. And she knew this. She wanted to send me to a school, but Dad was heavily against the idea of us going to school.

(*Id.* at 25:19–23.). While C.M. incorrectly blames only Petitioner for his parents' decision to home-school him (as well as inaccurately stating that his father insisted on staying the home-school course over his mother's objections), it is clear and uncontested that C.M.'s educational, social, and emotional development was stymied as a result of the parents' joint decision to home-school the child. Petitioner testified that he has enrolled C.M. in a public secondary school, the Colaiste Chu Chulainn, which C.M. will attend if he is ordered to return. (Tr. at 166:12–20, 346:9–22.)

F. **MARITAL STRIFE AND ALLEGED ABUSE**

To be sure, the parties' marriage and home-life in Ireland was mired, at times, in discord, tumult, and mutual unkindness, including verbal cruelty. It was clear to the Court, after hearing the testimony of all of the witnesses, that both Petitioner and Respondent love their children. It is equally clear, and without question, that each have to a lesser or greater degree, significant

11

limitations, physical and/or mental health issues, and interpersonal and personality deficits which, individually and in tandem, led to and compounded marital and familial discord and dysfunction.

Both Petitioner and Respondent level cross-allegations of incidents of domestic violence against each other, (S. McElligott Test., Tr. at 228:21–229:1; Ex. R-1 at 8), but offer no corroboration of substantiated charges, repeated intervention by law enforcement, reports by any third-parties or neighbors, or photographic or medical reports. Respondent also alleges sexual abuse which, it appears, stems from allegations of Petitioner's demands for sex and controlling behavior. (Ex. R-1 at 8.) Respondent did not testify in any regard to these, or any specific incidents or allegations of abuse.

The only non-party witnesses from Ireland who testified — Petitioner's father and sister — denied witnessing any abuse by Petitioner of Respondent, or C.M. for that matter. (M. McElligott Test., Tr. at 111:23–112:20; McCabe Test., Tr. at 134:18–135:5.) Ms. McCabe, when asked if she witnessed any abuse by Petitioner to his wife or C.M., was adamant: "No, no. Never, never. In fact, Stephen and Audrey, you know, they probably had their marital rows like anybody else, but they were very much good friends. They done everything together." (*Id.* at 134:21–25.)

Notwithstanding the parental and familial turmoil which he largely if not exclusively attributed to Petitioner, C.M. himself acknowledged to Dr. Montgomery "that he never saw his father strike his mother." (Ex. R-1 at 14.) To Petitioner's expert, C.M. initially stated that his father "hit or slapped" his mother but then appeared to walk it back, acknowledging "I don't know if he hit Mom. I never saw that. I won't say it didn't happen, but I never saw that." (Ex. P-12 at 26.) Notably, in the Court's interview of C.M., C.M. made no mention whatsoever of an allegation of physical abuse or assaults. Although Mrs. Mocco was only in Petitioner's presence a limited number of times through the years, she stated that she "did not witness [Petitioner] hurt the children

or my daughter." (Tr. at 492:1–11.) While the Court takes allegations of physical or sexual abuse with the utmost seriousness, neither party presented sufficient evidence to establish same.

### G.    C.M.'S LIFE IN IRELAND

Respondent did not present meaningful testimony in court from any witness, including herself, depicting C.M.'s life in Ireland. Mr. Mocco admittedly was only in C.M.'s presence in Ireland twice for the entirety of the child's life. One time, Mr. Mocco went to Ireland for J.M.'s christening and Respondent's bout with cancer. (M. Mocco Test., Tr. at 407:3–20.) A second time, on a 2018 family European boat trip, Mr. Mocco saw his daughter and the boys for just three days, when the boys were five and seven years old. (*Id.* at 407:22–409:25.) Petitioner was not present for this second trip. (*Id.* at 409:14–19; L. Mocco Test., Tr. at 460:3–5.) Mr. Mocco admitted he had not seen the boys from 2013 to 2018, or after the 2018 trip until November of 2022. (Tr. at 410:7–9.) Excluding the 2009 pre-child trip to Ireland when she tried to talk Respondent out of marrying Petitioner and another trip when C.M. was a newborn, Mrs. Mocco testified to only a few visits to Ireland over the years and stated that she also did not see Respondent or the boys in Ireland from 2018 onward. (*Id.* at 458:17–460:13.) In fact, she did not see them at all until their November 2022 trip to America. (*Id.* at 460:19–23.)

In his *in camera* interview with the Court and his four interviews with the parties' retained experts, C.M. painted, among other things, a picture of his unadulterated misery in Ireland, with disdain and outright loathing of his father, portraying Petitioner as evil incarnate. In contrast, he described his life here in the United States as Shangri-La. Within that same interview with the Court, other interviews he gave with the retained experts, and through other witness testimony, a somewhat different, nuanced, and fuller portrayal emerged, depicting the father, imperfect and flawed to be sure, in a more balanced manner. In short, as restated hereinafter, the Court found

C.M.'s *in camera* rendition of his life in Ireland and the United States, and his portrayal of his father, only marginally reliable as they appeared self-serving, contrived, and quite skewed.

In his interview with the Court, C.M. acknowledged age-appropriate activities in Ireland and reported that he "liked sitting in [his] room," watching television, and playing video games. (C.M. Tr. at 10:19–23.) By the age of eleven, he noted that he took a few international trips to the United States to visit family and two or three trips to Greece. (*Id.* at 4:14–5:24.) He acknowledged that he would see his paternal grandparents, who lived nearby, "[q]uite often." (*Id.* at 14:14–22.) He stated that they, as a family, celebrated Christmas and Easter together. (*Id.* at 16:7–9.) Not unlike many boys his age, he and J.M. served as altar boys at church, although C.M. certainly made clear he did not enjoy it. (*Id.* at 16:15–17:9.) As to his relationship with his brother J.M., which C.M. at one point described as "[b]rotherly love," C.M. said that J.M. would annoy him and that they would chase each other around the house, quite typical for brothers close in age. (*Id.* at 9:14–10:18.) Yet, in the same interview, he oddly indicated he was not sad at the limited contact that he now has with J.M., whom he had not seen in some eight months once J.M. was sent home to Ireland. (*Id.* at 9:17–25.)

Petitioner testified as to a number of activities he and C.M. did together. He stated that "we played — within the home, we played board games, we played karate and mess fighting, we played video games together, we read books together." (Tr. at 158:10–14.) On outside adventures, Petitioner taught C.M. how to ride a bike, took C.M. hiking, and went together with C.M. on photography trips, as photography was a vocation of Petitioner. (*Id.* at 158:15–18.) Together they camped in Limerick, learned about the McElligott ancestry family history, and took photographs "beside the old castle walls." (*Id.* at 158:18–23.) In her case in chief, Respondent offered no

witness who refuted the testimony of Petitioner and his family about Petitioner's involvement in C.M.'s life in Ireland.

C.M.'s paternal grandfather and aunt both testified that they knew C.M. from birth. (M. McElligott Test., Tr. at 95:11–12; McCabe Test., Tr. at 129:21–22.) Mr. McElligott stated that he and his wife, C.M.'s grandmother, saw C.M. regularly, including for family dinners, "some weeks it would be every other day and then sometimes it would be every other week." (Tr. at 123:6–18, 124:20–125:14.) C.M.'s grandfather testified that C.M. "loved his dad [and] . . . hung on every word his dad would say." (*Id.* at 95:13–96:22.) Mr. McElligott stated that Petitioner was a devoted dad to C.M. and was very "hands on" because Petitioner would "would take them everywhere . . . all over Ireland" on mountain hikes and camping. (*Id.* at 97:3–20, 98:13–17.) He specially recalled father-son trips to St. John's Castle and all over Limerick. (*Id.* at 97:3–10.) On visits to their house, C.M.'s paternal grandfather observed that sometimes the boys would be "playing in the streets." (*Id.* at 125:15–17.)

With the caveat that she was estranged from Petitioner for about two years, beginning in or around 2020 due to an argument with her brother, Petitioner's sister confirmed her perception and observations of what she viewed was a normal homelife of Petitioner with his sons. (McCabe Test., Tr. at 130:23–131:5, 139:6–8.) She stated that she and her brother reconciled because Petitioner "was in a very bad way" after the boys "were taken away from the country." (*Id.* at 130:23–131:19.)

As to C.M. and J.M., in Ireland, Petitioner's sister observed the boys at their paternal grandparent's home: "[T]hey go to mom and dad's, all the grandkids just gather there. You know, and they were happy kids, two happy boys." (*Id.* at 134:1–8.) She described C.M. and J.M. as "the

best of friends, brothers" and that "those two boys have never been separated." (*Id.* at 136:10–14.) As to Petitioner's parenting, Ms. McCabe testified:

> [C.M. and J.M. have] never been away from [Petitioner] . . . I know he's been a great dad. He's taken them on field trips, history trips. He's always teaching them all the time. He taught them good morals. He brought them up in the Catholic religion, and both him and Audrey were very passionate about it. And they were good boys.

(*Id.* at 131:6–19.)

### H.    THE NOVEMBER 2022 TRIP

On November 14, 2022, Petitioner gave written consent to Respondent to travel to the United States with C.M. and J.M. from November 14, 2022 until November 28, 2022. (Ex. P-4.) Mr. Mocco and Mrs. Mocco testified that Respondent came to the United States in November 2022 because Mr. Mocco had stopped sending money to Respondent. (P. Mocco Test., Tr. at 417:21–418:16, 419:1–20; L. Mocco Test., 462:25–463:17.) However, Dr. Montgomery testified that addressing Respondent's medical issues was one of the driving reasons for coming to the United States. (Tr. at 289:11–20 ("I think that [Respondent's migraines] was probably one of the more motivating reasons she came, because she was literally lying in bed in a dark room.").)

C.M.'s paternal grandfather, Martin McElligott, accompanied Petitioner, Respondent, and the boys on the drive to the airport for what was supposed to be a two-week holiday trip from Ireland to the United States in November of 2022. (M. McElligott Test., Tr. at 101:7–105:23.) He testified with a distinct, clear recollection of his observations of Respondent on that car ride. He stated that "Audrey was very quiet" and "didn't sound like somebody – somebody that's going on holidays." (*Id.* at 102:10–20.) He stated he "felt a kind of suspicion" but tried to dismiss it and chalked it up to perhaps her migraines. (*Id.* at 102:10–105:8.) But his observations led to the following premonition: "I just got this feeling with the two boys, and I got an awful feeling with

the two boys. I just got an awful feeling in my heart that I would never see them again." (*Id.* at 105:2–8.)

C.M. reportedly admitted that there was a pre-determined plan for him to remain permanently in the United States prior to the supposed two-week holiday vacation. Dr. Lane wrote: "[C.M.] reported that prior to leaving Ireland in November of 2022, his mother and grandparents asked him if wanted to stay in the United States when he comes over." (Ex. R-1 at 22.) Mrs. Mocco denied that she was a party to such a plan but acknowledged she could not speak for anyone else. (Tr. at 465:23–466:3, 490:8–491:10.) Mr. Mocco testified that he did not have a "secret plan" before Respondent arrived for her and the children to stay in the United States. (*Id.* at 412:16–25.) The evidence, more likely than not, suggests that the removal was pre-planned at least in the mind of Respondent and that it was relayed to C.M.

Regardless, Respondent advised C.M. of a "back up plan" in the event that C.M. is forced to return to Ireland. (Ex. P-12 at 23.) In detail, C.M. advised Dr. Lane that he was not worried about the returning to Ireland, and then stated, as follows: "If I had to go back, my mom would get divorced and file for custody. We would fly back when she has custody. It's a back up plan." (*Id.* at 27.) Perhaps more extreme, in response to Dr. Montgomery's question to him as to what he would do if it was determined that he must return to Ireland, Respondent's own expert reported C.M. as stating that he would make his father's life a "living hell and that the police would need to be called all the time." (Ex. R-1 at 15.)

## I.   PETITIONER'S ATTEMPTS TO ENSURE C.M.'S RETURN

After their arrival in New Jersey, quite quickly, it became apparent that Respondent was remaining in the United States with C.M. and J.M., against Petitioner's stated wishes. (S. McElligott Test., Tr. at 174:9–176:3.) Droves of essentially near constant Facebook messages

17

demonstrate that Petitioner was beseeching Respondent and their children to return to Ireland, many met with either silence or a response reporting a health issue of Respondent or one of the kids.[7]

On November 19, 2022, for example, Respondent apologized that she could not answer Petitioner's call, stating "I was very sick with migraine headaches. I was vomiting and very bad ." (Ex. P-5 at 76.) On November 22, 2023, Petitioner wrote Respondent complaining that she had not called him in three days, to which she stated: "Sorry heading to the Dr for migraines, not able for a phone call now, I'll call you when I feel better." (*Id.* at 75.) One minute later, Petitioner asked Respondent to have C.M. call him, and in a second message, asked "[i]s everything Ok?" (*Id.*) Respondent answered: "Everything is good just suffering with migraines." (*Id.* at 74.) In separate messages, Petitioner asked for C.M. or J.M. to call him but Respondent claimed they were at an arcade. (*Id.*) The next day, November 23, Respondent advised that she was going to a specialist, a neurologist, due to the ongoing migraines, and advised: "They say flying is out of the question." (*Id.* at 62.) She also made mention of certain dental and orthodonture appointments for the boys. (*Id.* at 61.)

In a series of messages on November 23, Petitioner requested that Respondent and the children return home, stating "I need to see my boys I haven't seem then in DAYS . . . I want them home." (*Id.* at 59, 61.) Less than one minute later, Respondent advised that J.M. needed to have a doctor examine him for scoliosis. (*Id.* at 59.) Respondent advised, as to her own situation, "I am not able to travel yet" and that her migraines "have been so bad" causing "vomiting, diarrhea and sweats." (*Id.* at 57.) Petitioner expressed mistrust about what was going on and added: "I've been

---

[7] The Court admitted a series of Facebook direct messages between the parties as Petitioner's Exhibit 5 (Ex. P-5). The numbering in the bottom right-hand corner of the exhibit's pages runs in reverse order from 76/124 to from 1/124. For simplicity, page references to "Ex. P-5" adopt this number. The right-hand margins of several of the messages are cut off.

looking forward to seeing my sons get them home." (*Id.* at 56–57.) The next day, on November 24, Respondent advised again she was going to see a neurologist and that she continued to suffer with "bad migraines and severe nausea." (*Id.* at 54.) In response, Petitioner advised that he was demanding the children return to Ireland on November 28, as agreed, and that failure to do so would be without his consent and that he would be pursuing their return through the Hague Convention. (*Id.*)

The parties' messages over the next few days largely memorialized that Respondent did not pick up Petitioner's attempted calls and video chats. (*Id.* at 52–53.) On November 27, Petitioner wrote Respondent beseeching her to contact him and reporting that Respondent's mother was not answering her phone, that her father stated that she, Respondent, is not home, and that Respondent's father will not call the boys inside to talk to Petitioner. Petitioner expressed concern: "[w]e are all sick with worry for you and the children." (*Id.* at 52.) Later, apparently relieved that he spoke to her and J.M., Petitioner asked for the date of the new flight for their return, and expressed sadness that J.M. contracted a fever. (*Id.* at 51.) The next day Respondent wrote that J.M. "was up all night with fever [o]f 103. 2," claiming that she was "on the phone with the Dr. will talk later." (*Id.* at 50.) On November 28, the day of the initially scheduled return flight, Petitioner wrote: "The last three days I broke down crying missing them. I broke down in front of the priest hopped into [C.M.'s] bed just to remember the smell of him and I started crying." (*Id.* at 49.) Later that evening, Respondent wrote that J.M. went to the doctor that day and was tested for streptococcus pneumoniae, which she claimed will take five to seven days to obtain the test results. (*Id.* at 48.) Petitioner wrote that "it felt weird that you weren't answering my call for a week" and "[e]very day I called and called and you wouldn't respond." (*Id.* at 46–47.) At 10:50 p.m. on

November 28, Respondent wrote Petitioner as follows: "the boys love it here they don't want to leave." (*Id.* at 44.)

Later that same evening, Respondent continued to cite that she was "sick with migraines and patterns," that she would be seeing a neurologist, and that she had "scary looking moles" and needed to see a doctor for them as well. (*Id.* at 42.) On November 30, Respondent advised that now C.M. had a fever of 104 degrees and that they were taking him to the doctor. (*Id.* at 41.) Later she advised that C.M. had COVID-19 and must quarantine for ten days. (*Id.* at 36.) After Petitioner repeatedly but unsuccessfully attempted to video chat with Respondent, Petitioner advised that he called Respondent's mother's phone six times without any answer. (*Id.* at 33.) On December 7, Respondent messaged that the doctor was concerned that C.M. might have pneumonia and that he must be quarantined another five days. (*Id.* at 31.) Immediately thereafter, serial attempted video chats from Petitioner, dozens in total, were not picked up by Respondent. (*Id.* at 26–29.)

There were discussions between Petitioner and Respondent regarding the possibility that Petitioner would travel to the United States to celebrate Christmas with the family. On December 11, 2022, Petitioner messaged Respondent inquiring about the prospect of getting tickets to fly over. (Stip. ¶¶ 20–21; Ex. P-5 at 14.) Petitioner testified that he thought the offer for him to join his family in the United States was a "ruse," and the trip never materialized. (Tr. at 192:2–193:1.) On December 19, 2022, Petitioner submitted an application to the Central Authority for Ireland pursuant to the Hague Convention, requesting the return of minors C.M. and J.M. (Ex. P-1.)[8]

---

[8] Petitioner also provided dozens of email correspondence between himself and Respondent from November 24, 2022 into June of 2023, admitted as Petitioner's Exhibit 11 (Ex. P-11). In short, the emails show Petitioner demanded the return of C.M.; complained of Respondent's failure to respond to his communications; expressed his concern for C.M.'s welfare; complained of C.M.'s lack of communications with Petitioner; and expressed his ongoing objections to C.M.'s enrollment in public school, participation in wrestling, and attendance at various medical appointments without Petitioner's knowledge or consent.

J.     **J.M.'s Return to the United States**

On January 1, 2023, from Ireland, Petitioner filed a complaint with the Bernardsville Police Department registering his supposed concerns of possible abuse of the children. (Stip. ¶ 27.) At 6:00 a.m., two police units arrived at the Moccos' Bernardsville property, in apparent flak jackets, to investigate the allegations. (P. Mocco Test., Tr. at 430:7–433:22.) The New Jersey Division of Child Protection and Permanency, in turn, was also contacted and commenced an investigation. (*Id.* at 431:13–432:5.) Mr. Mocco testified to his outrage at this baseless allegation, stating: "I pride myself, and I pride my family, on – doing our very best to be good citizens, respect the police, respect teachers. This was a cut out of a – out of a novel or a book or a short story, that it was incompatible . . . [I]t was beyond the pale." (*Id.* at 433:13–22.) Mr. Mocco decided that the status quo was "intolerable," and thus made the decision that J.M. must return to Ireland. (*Id.* at 433:23–434:9.) Mr. Mocco made clear that this decision was his and his alone. (*Id.* at 434:7–9.) In court, he testified that he was ambivalent about this decision, stating "on balance, if I could do it again, I might not make that decision." (*Id.* at 433:23–434:3.) On or about January 18, 2023, J.M., a nine-year-old boy, flew by himself from the United States to Ireland, where he was picked up by father and other family members. (McCabe Test., Tr. at 135:6–20; Ex. P-11 at 6–8.)

Ms. McCabe, C.M.'s paternal aunt, testified to her personal observations as to J.M. when she and other family members went to pick him up at the airport after he was sent back, alone, to Ireland:

> Oh, it was a terrible day. Myself, my sister went with my brother to the airport to pick up J.M. It was the saddest thing I ever seen in my life. He was standing there with a little Teddy . . . and he was – the child was traumatized, and he came running to his daddy. And when – the whole way home on the trip, he just spilled everything out to his daddy, like he just couldn't wait to tell him what happened to him. And there was very bad turbulence on the plane. He had nobody to look after him. And he wasn't supervised. They sent him

> home with ten dollars in his pocket. And he said he went to the toilet
> with the bad turbulence and he hit his head on something, and he
> was really afraid. He was nine years old.

(Tr. at 135:6–20.)

On the drive from the airport, Ms. McCabe observed that "the whole way home, [J.M.] just clung to his daddy, clung to him. He just kept hugging him, and he said, I love you daddy." (*Id.* at 135:22–25.) Respondent's own expert, Dr. Montgomery, readily acknowledged the potential, significant trauma when siblings are separated: "I think it's always fraught with all kinds of issues and problems . . . But yeah, that is a problem, those kids being separated . . . I didn't think I could go there. I never interviewed J.M., so it wasn't a path I was going down." (Tr. at 295:18–296:3.)

### K.    C.M.'S LIFE IN THE UNITED STATES

Since arriving in the United States, C.M. enrolled in school, participated in after-school events, and visited doctors, all without Petitioner's consent.

The record does not reveal when precisely the children enrolled in school, when the decision was made to enroll them, and who made the decision. The parties agreed that the children were enrolled at some point in December 2022. (Stip. ¶ 22.) At some point that same month, Petitioner first learned from J.M. that the children had been enrolled in school. (S. McElligott Test., Tr. at 179:22–180:17.) Dr. Montgomery recounted from her interview with Mr. Mocco that he was the one who insisted that C.M. and J.M. be placed in school. (Ex. R-1 at 22.) However, Mrs. Mocco testified that she and Respondent "helped facilitate" the children being enrolled in school, which decision was made to ensure the children's education was not interrupted "while we were waiting for Audrey to get well." (Tr. at 470:4–9.) Mrs. Mocco also did not deny that Respondent advised her "multiple times" that Petitioner did not consent to C.M.'s attendance at school and various

medical appointments, and that these discussions "may have been and they may not have been" in front of C.M. (*Id.* at 479:20–480:20.)

C.M. told the Court that he enjoys attending the Bernardsville Middle School, where he has friends he sees outside of school, including at each other's houses. (C.M. Tr. at 20:13–20, 21:16–21.) C.M. said that he adjusted to school in New Jersey in "like three days." (*Id.* at 21:13–15.) He said he has made many friends and named his three favorites, including Max, noting that they have been to each other's homes. (*Id.* at 21:22–10.) C.M.'s maternal grandparents also testified that C.M. enjoyed school in Bernardsville. (L. Mocco Test., Tr. at 471:2–10.) Mr. Mocco testified that C.M. was so eager for school to start again that he had been "practic[ing] getting up early . . . so he's on the bus on time to be brought to the middle school." (Tr. at 423:2–5.)

Since coming to the United States, C.M. also joined the wrestling team. (C.M. Tr. at 20:23–21:6.) The Moccos' home has a gym in a separate building on the property that has wrestling mats, a bench, and pullup bars that C.M. enjoys using. (*Id.* at 22:11–25.) C.M.'s grandfather also testified that C.M. was active with the choir in school. (Tr. at 422:4–7.) C.M. attended art camp over the summer, which he said was "[v]ery fun." (C.M. Tr. at 23:7–11.)

## L.   C.M.'S TREATMENT OF HIS FAMILY IN THE UNITED STATES

After C.M.'s removal from Ireland, multiple witnesses testified to a sea change in C.M.'s treatment of and demeanor towards his father, the Petitioner. In his testimony and in real-time, contemporaneous written communications, Petitioner consistently observed C.M.'s marked and newfound hostility towards him. Petitioner testified as follows:

> [C.M.] was very aggressive towards me on the phone. He was obviously not speaking like the C.M. that I know or a 12-year-old child. He was acting very tough . . . And, you know, he was just aggressive and he — then, as the calls progressed over the months, he became more aggressive and he started calling me out on abuse on calls . . . He started lobbing, you now accusations of abuse. And

> he got more and more intense to the point where I just really — I
> felt he was being coached on the calls, and it was just upsetting for
> me.

(Tr. at 170:3–13.)

Similarly, in an email dated February 28, 2023, Petitioner complained about his limited and incongruent communications with C.M.: "[C.M.] is not speaking with me properly and not behaving like the [C.M.] I knew before he left Ireland. Anything he did say in response to me on this call sounded very rehearsed and not like the [C.M.] I know who was always happy to see and speak with his father." (Ex. P-11 at 10.) On May 8, 2023, in another email, Petitioner wrote that J.M. "burst into tears" after C.M. called him a "[f]ucking pussy" among other insults. (Ex. P-11 at 15.) In the same email, Petitioner recounted how J.M. felt that C.M. "is not the same person," and that Petitioner's "heart is breaking for [C.M.] and our children who were inseparable little boys from youth." (*Id.*)

Both Petitioner's father and sister made similar observations of C.M. which were recounted in their trial testimony. Mr. McElligott testified: "Well, it changed after awhile, just the kind of change, he wasn't the same little boy. He wasn't talking like he would usually talk . . . [H]e wasn't speaking to his dad like he would normally speak to anyone . . . He was speaking very, very, I thought very cheeky," a slang term which he described as disrespectful. (Tr. at 98:23–100:9.)

C.M.'s aunt, Ms. McCabe, too noticed a marked transformation in the once gentle, amiable nature of C.M. and his treatment of his father. While in Ireland, she stated that C.M. spoke to his father "in a loving way. He was always with Stephen . . . I've never heard him be cheeky or naughty towards Stephen." (*Id.* at 133:15–20.) In stark contrast, she observed C.M. interact with her brother, Petitioner, on a recent video call from the United States. She testified:

> [I]t seemed like the child — the way he was speaking, it just wasn't
> him. It didn't seem like a child that was speaking. It seemed like an

> adult, you know. It was like, as we would say here in Ireland, fireside
> talk, where you listen to adults speaking and you are repeating it.
> And that's what it felt like to me. He just didn't feel like a child that
> – he was just very angry . . . He looked like he was stressed, you
> know, because he was under pressure. And it was very sad to see."

(*Id.* at 142:7–17.)

### M. *In Camera* Interview with C.M.

On August 15, 2023, the Court conducted an *in camera* interview with C.M., which began

shortly after 10:00 a.m. The Court met C.M. in the courtroom, who was seated alongside his

mother, his maternal grandmother, and one of Respondent's lawyers. After a brief exchange of

greetings, the Court escorted C.M. into Chambers. The interview took place at a conference table

in the Court's personal Chambers. The Court sat across the table from C.M., and a glass of water

was placed in front of C.M. The entire interview lasted approximately thirty-five minutes.[9] No

substantive discussions regarding this case occurred with C.M. off-the-record at any time, and the

only other attendee was the court reporter.

C.M. presented as a well-groomed, healthy twelve-year-old boy. He was articulate

throughout, appeared to carefully listen to the questions posed, and gave clear answers. At the

outset, he made clear that he understood that he must be honest in his answers and that he

understood the difference between the truth and a lie: "Well, the truth is what happened and a lie

would be what didn't happen." (C.M. Tr. at 3:1–5.) When asked as to his understanding of why he

was here in the courthouse talking with the Court, he said: "That you're here to ask questions, I'm

here to answer them, and, depending on the answers of the questions, could determine where I go."

(*Id.* at 7:23–8:2.) The following exchange then immediately took place:

---

[9] The Court received proposed questions by both parties which helped guide the Court in its questioning.
Rather than follow a script, however, the Court instead opted for a more natural conversation with C.M.
and used both parties' questions in terms of covering some general topics.

> Court:  And where did you get that understanding from?
> C.M.   Just knowing about the court case.
> Court:  And how did you come to learn about the court case?
> C.M.   It being, like, the main subject for the last, like, six months.
> Court:  Main subject where? At home?
> C.M.   Yeah.
> Court:  And who have you talked about this case with?
> C.M.   My grandparents and my Mom.
> Court:  Okay. And your grandparents here in the United States?
> C.M.   Yes.

(*Id.* at 8:3–17.)

C.M. was eleven years old in November of 2022, when he traveled to the United States with his mother and younger brother, J.M., who is now ten years old. He stated that he was born in Drogheda, Ireland, where he lived until November of 2022. (*Id.* at 3:24–4:13.) In Ireland, he lived with his father, mother and J.M. He described his feelings for his younger brother as "brotherly love" and recalled that J.M. would annoy him and they would chase each other around the house. (*Id.* at 9:16, 10:12–14.) C.M. stated that since he's been in the United States and J.M. returned home, they speak "maybe" once a week, and that the length of the telephone calls was getting "shorter and shorter." (*Id.* at 9:17–19, 10:1–2.) He added that he was not saddened by the frequency or shortening length of the calls with his younger brother. (*Id.* at 9:21–25.)

C.M. stated he is going into seventh grade and was home schooled in Ireland. (*Id.* at 3:18–21.) He stated that his mother was principally his teacher, adding that "My Dad never really got helping." (*Id.* at 11:20–24.) He stated that he did not enjoy being homeschooled, and according to C.M., his mother was not able to do much teaching due to frequent and debilitating migraine headaches: "Well, my Mom, see, she gets – she used to get migraines very, very often in Ireland, and should would have to go up in her room in complete darkness and just shut away for the whole day. And then she would come down and make breakfast and look like a husk." (*Id.* at 13:5–13.) He then described a "husk" as: "It's like something that's just the outer shell, there is nothing

inside of it, it's just walking around." (*Id.* at 13:14–20.) Later on, C.M. expounded on his experience with being homeschooled by stating:

> It never really did [happen]. It just sort of happens like as a one-off thing. Because like I said, my Mom got migraines. I couldn't really get schooled by her. And she knew this. She wanted to send me to a school, but Dad was heavily against the idea of us going to school.

(*Id.* at 25:17–23.)

In Ireland, C.M. stated that he liked being in his room, watching television, and playing video games. He stated he had a PlayStation 4 and a "VR headset," which he described as a virtual reality contraption that he put on his face which enabled him to meet people. He added, gratuitously, that he "didn't really meet anybody in Ireland. I wasn't really allowed outside most of the time." (*Id.* at 10:19–11:11.) In describing a typical day, C.M. stated he would "[w]ake up, stay in bed, sometimes I would go downstairs, I would get a snack. I would – something would fall, get yelled at, go back upstairs, and then play video games and watch TV." (*Id.* at 25:9–17.) He advised that it was his father who would yell at him. (*Id.* at 26:13–17.)

In addition to his nuclear family, C.M.'s paternal grandparents, whom he referred to as "Nanny and Granda," lived very nearby, "[l]ike just up the road." (*Id.* at 13:21–14:13.) He said he would see his grandparents "quite often," and that they would watch television together and relax. (*Id.* at 14:14–15:16.) He also stated that they would go to the grandparent's home to assist in household repairs and the like. (*Id.* at 15:20–16:6.) He stated they celebrated Christmas and Easter as a family, that he traveled to the United States a few times in the past to visit his mother's family, and had made two or three trips to Greece. (*Id.* at 4:14–15:18, 16:7–14.) He stated that he has an uncle and two aunts in Ireland, who live quite far and whom he rarely saw. He also has a younger cousin whom he saw "quite a bit," before he arrived in the United States. (*Id.* at 19:3–20:12.)

On the topic of religion, C.M. stated that his family attended religious services "a lot," and more specifically, "[e]verything from Greek Orthodox and Roman Catholic, because we attended both churches." (*Id.* at 16:10–17:7.) C.M. made his views on attending religious services clear: "It was Dad's idea. Made no sense to me . . . for Christmas, it would be like a five-hour mass, you know, Easter would be like four hours." (*Id.* at 16:15–21.) In Ireland, he attended Church "like three days a week," and that "Dad made us altar boys." (*Id.* at 17:5–12.) When asked if he enjoyed that, he responded: "No." (*Id.* at 17:8–9.) When asked if he had a cellphone when he lived in Ireland, C.M. indicated he did not. (*Id.* at 17:16–18.) He said his father would not let him, and when asked how that made him feel, C.M. answered: "All I wanted was a Nokia." (*Id.* at 17:19–18:2.)

As evidenced below, the Court's rather straightforward question about Petitioner's employment history prompted the following exchange:

> Court: Does your Dad work out of the home?
> C.M.: No. He used to for a little bit.
> Court: Okay.
> C.M.: For certain companies. I think one was Air, one was Copytext, and I don't remember the other one's name. But he worked for them for a very short time, and each time he was let go, and then he never worked again after the third, and he just took money from my grandparents and the welfare to support us.
> Court: And when you say your grandparents, I assume those are your grandparents in Ireland?
> C.M.: No. It was my grandparents here.
> Court: Okay.
> C.M.: So he didn't want anything to do with them, but he was happy to take 2,000 a month.
> Court: 2,000 what?
> C.M.: Euros.

(*Id.* at 12:9–25.)

C.M.'s contact with his father while he has been in the United States has been quite limited. C.M. explained as follows: "My Mom says I have to, at a minimum, talk to him once a week, so I've chosen the minimum." (*Id.* at 18:13–18.) C.M. stated that his mother "usually" would be in the living room with him during these weekly video calls with his father. (*Id.* at 27:11–12.)

Since November in 2022, C.M. has lived with his mother and his maternal grandparents in Bernardsville, New Jersey. (*Id.* at 20:13–22.) In the United States, in addition to her parents, Respondent has six siblings, four of whom live in New Jersey, and a fifth is in the process of moving here. (*Id.* at 5:20–7:7.) He also named a number of cousins who also mostly live in New Jersey. (*Id.* at 7:8–21.)

He stated that he attended public school, which he enjoyed, and described a typical school day as getting up, going to school, doing homework, eating dinner, and going to sleep. (*Id.* at 20:13–20.) He stated his transition to life here in the United States was rather instantaneous, "like three days." (*Id.* at 21:13–15.) He said he has made many friends and named his three favorites, including Max, noting that they have been to each other's homes. (*Id.* at 21:22–10.) C.M. stated he participated in wrestling, which he did at school, and that he "enjoyed using our homemade gym that we have . . . We have wrestling mats there . . . We've got pull-up bars, we've got a bench, everything . . . It's like a separate little building" on his grandparents' property. (*Id.* at 22:13–23:6.) He also attended art camp over the summer, which he said was "[v]ery fun." (*Id.* at 23:7–11.)

When asked why he liked going to the public school in New Jersey, he answered: "Well, I'm allowed to meet people. I'm allowed to go outside. I've made friends. And I have great teachers. And I've learned a lot. Like, when I mean I learned a lot, like 800 percent of the average student growth . . . ." (*Id.* at 23:19–24.) He also advised that he attends church services in New

Jersey once per week, and that he now has a cellphone, a Samsung, which his mother got for him here in the United States a few months ago. (*Id.* at 18:3–12, 28:4–12.)[10]

## N. EXPERT TESTIMONY

Each party presented testimony from an expert who interviewed C.M. and formed an opinion on the applicability of the wishes of the child exception.[11]

Both experts concluded that C.M. was sufficiently mature for the Court to take his view into consideration and that C.M. expressed particular objections to returning to Ireland. (Ex. P-12 at 28–29; Ex. R-1 at 26–27.) However, the experts' conclusions diverged over whether C.M.'s objections to return were the product of undue influence.

---

[10] At the close of evidence, the Court sustained Petitioner's objection (ECF No. 38) to Respondent calling C.M. at trial. (Tr. at 496:11–499:25.) In a recent unpublished decision, the Third Circuit held that the district court did not err "by refusing to interview the children and precluding their testimony at the hearing." *J.C.C. v. L.C.*, No. 20-3289, 2022 WL 985873, at *2 (3d Cir. Mar. 31, 2022). The Court found no authority supporting the proposition "that a district court is required to conduct an interview with the child" and that the district court did not abuse its discretion because it had already heard from four of respondent's witnesses and "determined that allowing the children to testify at the evidentiary hearing would be 'redundant, needlessly harmful to the children, and potentially influenced by respondent.'" *Id.* (cleaned up) (citing district court decision); *see also Velozny ex rel. R.V. v. Velozny*, 550 F. Supp. 3d 4, 23 n.8 (S.D.N.Y. 2021), aff'd, No. 21-1993, 2021 WL 5567265 (2d Cir. Nov. 29, 2021) (finding *in camera* interview of child unnecessary).

As the Court found on the record here, the Court had ample opportunity to hear from C.M. Respondent herself requested that C.M. sit for an *in camera* interview with the Court. (ECF No. 30.) The Court interviewed C.M. for approximately thirty-five minutes in chambers, incorporating the parties' proposed questions into its own inquiry. C.M. sat for multiple interviews with the parties' testifying psychologists — including three separate interviews with Respondent's expert — who opined on the wishes of the child exception's application to C.M. Like the district court in *J.C.C.*, the Court here also sought to avoid testimony from C.M. that would be "redundant, needlessly harmful to the children, and potentially influenced by respondent." *J.C.C.*, 2022 WL 985873, at *2 (citing district court decision).

[11] Dr. Lane, a licensed clinical psychologist and certified school psychologist in New Jersey, testified for Petitioner. Dr. Lane interviewed Petitioner, Respondent, and C.M., and administered the Kaufman Brief Intelligence Test to C.M. (Ex. P-12 at 2.) Respondent presented the testimony Dr. Montgomery, a licensed forensic and clinical psychologist. Dr. Montgomery interviewed Petitioner and Respondent once and interviewed C.M. three times. (*Id.* at 1–2.) Respondent's expert also interviewed several other individuals: C.M.'s maternal grandfather, the parents' of C.M.'s friends, C.M.'s teachers, three of Respondent's therapists, and C.M.'s therapist. (*Id.* at 3–4.) Dr. Montgomery administered the Peabody Picture Vocabulary Test (measuring receptive language development), the Raven Progressive Matrices (measuring cognitive ability), the self-reported Childhood Trauma Questionnaire, and the Parenting Report Card to C.M. (*Id.* at 17–18.)

The Court found Dr. Lane's consideration of the information she received more balanced and credible than Dr. Montgomery's analysis. Dr. Lane's recitation of statements relayed by Petitioner is couched in terms that make clear that she did not accept at face value what she was told.[12] In comparison, Dr. Montgomery's record of her interview with Respondent does not include phrases indicating a detached evaluation. (Ex. R-1 at 6–10.) Rather, Dr. Montgomery's report suggests that she accepted her client's self-serving statements, blindly at face value. Other excerpts from Dr. Montgomery's report could have been lifted directly from the pages of an advocate's brief, such as when she wrote:

> [Respondent's] marriage and life in Ireland had grown intolerable related to her husband's abusive treatment, control, and chronic unemployment. She, however, was primarily concerned regarding her children, who were academically delayed due to their lack of school attendance and social isolation in Ireland. To that end, she enrolled the children in public school in Bernardsville, where the children began to make amazing progress.

(*Id.* at 4.) It appeared to the Court, throughout Dr. Montgomery's report and testimony, that her opinions were affected by Respondent's litigation posture, and reflected same accordingly, with virtually no exception or deviation.

Like Dr. Lane, Dr. Montgomery interviewed Petitioner and Respondent. Consistent with the language from her report, Dr. Montgomery's in-court testimony reflected a marked tendency to adopt wholesale, conclusory statements espoused by Respondent without considering tempering facts. (*See, e.g.*, Tr. at 283:10–13 (testifying that Respondent described "significant abuse, chaos, loud screaming, yelling, things being thrown about"); *id.* at 294:13–16 (testifying that in Ireland

---

[12] For example, Dr. Lane noted that Petitioner "denied" abuse, "reported" on how he disciplined his children in Ireland, and "characterized" Respondent's discipline as occasionally excessive. (Ex. P-12 at 5.) Dr. Lane also specifically noted where Petitioner attempted to minimize his actions in his interview, writing that "[w]hile [Petitioner mentioned yelling, he did not characterize it as such; instead, he characterized it as raising his voice." (*Id.*)

C.M. had "not at all, or barely at all, had no real friends there . . . he was very, very isolated").)

Dr. Montgomery's answers while testifying often included adjectives that suggested her role as an advocate more than as a neutral observer. (*See, e.g.* Tr. at 285:3–4 (testifying that C.M. was "very, very withdrawn"); Tr. at 291:24–245 (testifying that C.M. described his home life as "chaos, it was absolutely chaotic").) Dr. Montgomery's responses to counsel's questions lacked any nuance one would expect from a neutral observer. (*See, e.g.*, Tr. at 283:24 ("No. *Everybody* who has worked with her and seen her has corroborated that she's a classic battered woman." (emphasis added)).)[13]

## II.    **LEGAL STANDARD**

The Hague Convention on the Civil Aspects of International Child Abduction, as implemented in the United States by the International Child Abduction Remedies Act, 22 U.S.C. § 9001, *et seq.*, was adopted "in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). When a child less than sixteen years old is "wrongfully removed or retained," the Convention directs the Court to "order the return of the child forthwith," unless one of several enumerated exceptions applies. *Id.* at 9. This effectuates the Convention's twin goals: "(a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody and of access under

---

[13] The Court also noted contradictions between Dr. Montgomery's report and her in-court testimony that undermined the credibility of her analysis. Several weeks after C.M. arrived in the United States, Ms. Mocco made audio recordings interviewing C.M. and J.M. about their lives in Ireland. (M. Mocco Test., Tr. at 466:4–15; Ex. R-1 at 23.) Dr. Montgomery summarized that in the recordings the children expressed "how relieved they were to be in America," recounted "their father's abusive treatment," and that J.M. characterized his father "as selfish and neglectful." (Ex. R-1 at 23.) However, when asked on cross examination about whether it was possible that the children were "being prompted to answer in a certain way," Dr. Montgomery agreed that she "ha[d] no way of knowing anything about these videos," that she prefers not to rely on audio or video recordings, and that she therefore "do[es] not weigh them heavily." (Tr. at 337:17–24.) That statement contradicted Dr. Montgomery's statement in her report that these recordings "were quite eliciting" in her evaluation of C.M.'s objections to returning to Ireland. (Ex. R-1 at 26.)

the law of one Contracting State are effectively respected in the other Contracting States."

*Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010) (quoting Hague Convention, art. 1). As

the Supreme Court summarized:

> The Convention is based on the principle that the best interests of
> the child are well served when decisions regarding custody rights
> are made in the country of habitual residence . . . Ordering a return
> remedy does not alter the existing allocation of custody rights . . .
> but does allow the courts of the home country to decide what is in
> the child's best interests.

*Abbott*, 560 U.S. at 20. Both the United States and Ireland are Convention signatories. Hague

Conference on Private Int'l Law, Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child

Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24.

Notably, the Hague Convention was "not designed to settle international custody disputes."

*Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006). A court's goal in deciding a Hague

Convention petition is "to restore the status quo prior to any wrongful removal or retention, and to

deter parents from engaging in international forum shopping in custody cases." *Id.* While this

limitation on courts' authority under the Convention does not circumscribe the type of evidence

they may consider if relevant to a petitioner's petition or a respondent's defense, courts are wary

of arguments ostensibly raised under the Convention but which in reality seek to embroil them in

traditional custody disputes. *See Baxter v. Baxter*, 423 F.3d 363, 374 n.9 (3d Cir. 2005) (noting

that assessments of "unsupported allegations between the parties regarding their respective fitness

as parents . . . are normally reserved for a custody proceeding" (citing Hague Convention, art. 19)).

In a proceeding brought under the Convention, the petitioner "bears the initial burden of

proving by preponderance of the evidence that the child was habitually resident in a State signatory

to the Convention and was wrongfully removed to a different State as defined by Article 3."

*Karpenko*, 619 F.3d at 263. The petitioner can meet his burden by showing:

> (1) when the removal or retention took place; (2) the child's habitual
> residence immediately prior to such removal or retention;
> (3) whether the removal or retention breached the petitioner's
> custody rights under the law of the child's habitual residence; and
> (4) whether the petitioner was exercising his or her custody rights at
> the time of removal or retention.

*Id.* (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270–71 (3d Cir. 2007)).

Once the petitioner makes out this *prima facie* showing, the court must order the child's return, unless the respondent is able to establish one of five affirmative defenses. *Karpenko*, 619 F.3d at 263. "These affirmative defenses are narrowly construed to effectuate the purposes of the Convention and, even where a defense applies, the court has the discretion to order the child's return." *Karkkainen*, 445 F.3d at 288 (citing *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995)).[14]

## III.  **DISCUSSION**

### A.  *PRIMA FACIE* CASE FOR RETURN

The Court concludes that Petitioner has made out a *prima facie* case under the Convention that C.M. was wrongfully retained in the United States after removal from his habitual residence in Ireland, in violation of Petitioner's custody rights under Irish law, which he was exercising at the time of wrongful retention.

#### 1.  C.M.'s Date of Retention

Under the Hague Convention, the date of a child's retention "is the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through

---

[14] The Convention encourages courts to determine whether return is appropriate "us[ing] the most expeditious procedures available." *Golan v. Saada*, 142 S. Ct. 1880, 1888 (2022) (quoting Hague Convention, art. 2); *see also Chafin v. Chafin*, 568 U.S. 165, 180 (2013) ("Expedition will help minimize the extent to which uncertainty adds to the challenges confronting both parents and child.").

words, actions, or some combination thereof." *Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017). In *Blackledge*, the Court found that the district court erred in determining the retention date by "looking solely to Petitioner's original consent for [the child] to reside in [the United States]" without "assess[ing] whether Petitioner's subsequent communications, up to and including the filing of his Hague Convention petition, effected a withdrawal of that consent." *Id.*; *see also Baxter*, 423 F.3d at 371 ("The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention."). Determining a precise retention date is "by necessity, fact-intensive and will vary with the circumstances of each case." *Blackledge*, 866 F.3d at 179.

Petitioner contends that the wrongful removal or retention occurred sometime in November 2022. (Pet. Br., ECF No. 37 at 16.) In support, he points to evidence that although he initially agreed for his wife to take C.M. and J.M. to the United States, he objected to them remaining once Respondent indicated she would not return the children. (*Id.*) Respondent argues that there was no wrongful removal because Petitioner consented to C.M.'s travel to the United States. (Resp. Br., ECF No. 35 at 12.) Respondent further argues that she did not retain C.M. in the United States because Petitioner "consented" and "acquiesced" to C.M.'s continued stay in the United States. (*Id.* at 12–14.)[15]

---

[15] Showing consent is relevant both for Petitioner in making out his *prima facie* case of wrongful retention, *see Blackledge*, 866 F.3d 179 ("[T]he retention date is the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent."), and for Respondent in establishing "the defense of consent or acquiescence to the removal or retention by a preponderance of the evidence." *Baxter*, 423 F.3d at 368. For the reasons below, the Court's conclusion that Petitioner did not consent or acquiesce for Respondent to retain C.M. in the United States past November 28, 2022 is unaffected by which party bears the burden of showing consent.

Because Respondent took C.M. to the United States with Petitioner's explicit permission (*see* Ex. P-4), C.M was not wrongfully removed.[16] The Court therefore considers only whether he was wrongfully retained in the United States after arrival. *See Didon v. Castillo*, 838 F.3d 313, 320 (3d Cir. 2016) (considering only wrongful retention when "[respondent] permitted [petitioner] to travel to the United States with the children"). The Court finds that Respondent's wrongful retention occurred on November 28, 2022. Nonetheless, even if the Court construes the parties' communications during the following month as extending Petitioner's consent until December 30, 2022, the Court's conclusion that Petitioner did not consent to C.M. remaining in the United States permanently is unchanged.

Petitioner's pre-departure, written consent for C.M. to travel to the United States with Respondent was explicitly limited for the time from "November 14 to November 28, 2022." (Ex. P-4.) On November 23, 2022, Respondent first notified Petitioner via Facebook message that they were "probably not going to be able to come back" to Ireland on the agreed-upon date and explained that she had made medical appointments for C.M. (Ex. P-5 at 60–63.) Petitioner expressed unequivocal opposition to C.M. seeing a doctor in the United States, (*id.* at 58–61), or remaining past November 28. (*Id.* at 57, 61.) Petitioner's communications over the next five days evidence his repeated requests that Respondent return the children. (*Id.* at 51–52.) On the date Petitioner's original consent expired — November 28 — Petitioner emailed Respondent requesting proof that the children's medical conditions prevented them from flying and explicitly invoking the Hague Convention to compel the children's return. (Ex. P-11 at 1.) Thus, Respondent did not consent to C.M. being retained in the United States past November 28, 2022.

---

[16] A child is removed when he is "tak[en] . . . from the person who was actually exercising custody." *Feder*, 63 F.3d at 220 (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10503 (1986)).

Developments between the parties during the following month did not extend Petitioner's consent beyond November 28. The Court is mindful of the Third Circuit's admonition to account for "the nature or scope" of Petitioner's alleged consent. *Baxter*, 423 F.3d at 370 ("Article 13(a) does not provide that if a parent consents to removal of the child for a period, *under certain conditions or circumstances*, that retention of the child beyond those conditions or circumstances is necessarily permissible." (emphasis added)). Petitioner relenting to C.M. remaining in the United States until the end of December 2022 was conditioned on him returning home shortly afterwards. Specifically, Petitioner wrote:

> I don't know what your plans are exactly, but I want you to have a good Christmas in Bernardsville w[ith the] two boys. I hope you get to see your neurologist December 30th and that all will be well. All I ask is that you pl[ease] communicate with me over the coming days and weeks ahead to give me an idea of when my lovely wife a[nd] family is coming home."

(Dec. 8, 2022 Facebook Message, Ex. P-5 at 25.) At trial, Petitioner testified that his only reason for agreeing to the extension was because he "wasn't getting any communication with C.M. or any of them." (Tr. at 175:20–176:3.) On December 19, 2022 — eleven days before December 30 — Petitioner submitted an application to the Central Authority for Ireland requesting his children's return. (Ex. P-1.)

Even if Petitioner permitted C.M. to remain one month longer, his consent was predicated on the "condition[] or circumstance[]," *Baxter*, 423 F.3d at 370, that C.M. would return shortly afterwards and that he would not attend school in the United States or receive non-emergent medical care. (S. McElligott Test., Tr. at 179:5–13 ("I didn't consent to [C.M.] going to school. . . . I never consented to him going and visiting any psychiatrists or doctors.").) At no point did Petitioner contemplate permitting C.M. to settle in the United States permanently. (S. McElligott Test., Tr. at 170:18–171:2.) In a January 4, 2023 email, Petitioner wrote, "[a]t this point, Audrey,

I would like to know when my children will be returning to Ireland." (Ex. P-11 at 2.) Later in January, Respondent called the local New Jersey police department to request they conduct a welfare check because Respondent "wasn't hearing back" from Respondent. (S. McElligott Test., Tr. at 367:12–16.)[17]

The Court is not persuaded by Respondent's contention that Respondent acquiesced to C.M.'s presence in the United States by failing to file his formal Petition until June 9, 2023. (Resp.'s Br. at 13–14.) Three days before filing his petition, Petitioner emailed Respondent one final time requesting an "update [] on when [she is] sending [C.M.] home." (June 5, 2023 Email, Ex. P-11 at 19.) The parties' communications, confirmed by their in-court testimony, evidence Petitioner's initial attempts to accommodate Respondent's reasons for delaying C.M.'s return — because of Respondent's medical issues, C.M.'s and J.M.'s illnesses in early December 2022, and Respondent's wish to remain in New Jersey with her family for Christmas. There is no evidence that Petitioner ever agreed for C.M. to remain in the United States beyond December 30, let alone permanently.

Here, the Court finds that Petitioner neither consented to C.M.'s indefinite removal before the trip nor acquiesced after his arrival in New Jersey to remaining in the United States permanently. Petitioner originally consented to a two-week trip to the United States. At most, Petitioner arguably acquiesced to C.M. remaining through December 30, 2022 to accommodate his family's health issues and holiday plans, but only in the face of Respondent's evasive refusal to return the children. Thus, Petitioner's consistent position, "clearly and unequivocally communicated through words [and] actions," was that he did not consent to C.M. remaining in the

---

[17] Other communications between the parties from January through June 2023 documented Petitioner's adamant and continued request for C.M.'s return. (*See* Jan. 19, 2023 Email, Ex. P-11 at 6; Jan. 25, 2023 Facebook Message, Ex. P-5 at 9; Feb. 1, 2023 Email, Ex. P-11 at 8; Feb. 18, 2023 Email, Ex. P-11 at 9; Mar. 14, 2023 Email, Ex. P-11 at 11; May 11, 2023 Email, Ex. P-11 at 17.)

United States past November 28, 2022. *See Blackledge*, 866 F.3d at 179. As explained below, whether the date of retention is November 28 or December 30 does not affect the rest of the Court's analysis.

### 2. C.M.'s Habitual Residence

The Hague Convention provides no specific definition of "habitual residence." *Blackledge*, 866 F.3d at 180. The Third Circuit has recognized a child's habitual residence as "where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Id.* (quoting *Baxter*, 423 F.3d at 368). The Court's focus in the analysis is "on the child." *Karkkainen*, 445 F.3d at 296 (quoting *Feder*, 63 F.3d at 224). The Court looks to both "the child's acclimatization" and the "shared parental intent," the latter of which is relevant both as it colors the child's attitude towards his contacts with the new location and because it "bears on the parents' own intentions 'regarding their child's presence in a particular place.'" *Blackledge*, 866 F.3d at 180 (quoting *Karkkainen*, 445 F.3d at 292). Making this determination requires evaluating the "totality of the circumstances specific to the case." *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020). The date of retention "establish[es] the relevant date" for determining a child's "habitual residence." *Karkkainen*, 445 F.3d at 290.

Here, C.M.'s habitual residence immediately prior to the wrongful retention was Ireland. As the Supreme Court observed in *Monasky*, "[c]ommon sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Monasky*, 140 S. Ct. at 727. This is one such case. C.M., an Irish citizen, has lived with his mother, father, and brother in Ireland since his birth in 2011 until he left the country for a two-week trip to the United States on November 14, 2022. Until he was wrongfully retained in the United States, C.M.'s entire life was Ireland.

The Court need only briefly consider whether a "change in geography and passage of time," *Karkkainen*, 445 F.3d at 294, after C.M.'s arrival in the United States established C.M.'s habitual residence in New Jersey. Respondent argues that C.M.'s "meaningful connections" to New Jersey — including his school, a sports program, and friendships — show he has acclimatized to his life here. (Resp. Br. at 16.) "For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Monasky*, 140 S. Ct. at 727.[18]

There is no evidence that C.M. formed "meaningful connections" to New Jersey within the weekslong period when Petitioner consented to C.M.'s holiday in New Jersey. Even without fixing the exact date of retention as November 28 or December 30, the Court's finding that C.M. did not acclimatize to New Jersey would remain unchanged. Respondent's evidence of C.M.'s school, friends, family, and other activities in New Jersey — such as might be relevant to the Court's wishes of the child analysis — do not show that C.M. had acclimated by December 30, 2022. Indeed, Respondent cites no case, nor can the Court find one, suggesting six weeks, let alone two weeks, constitutes "an appreciable period of time," *Monasky*, 140 S. Ct. at 727 n.3, in which acclimatization can occur. The Court is "mindful [to] avoid setting the bar for acclimatization too low, lest [it] create[s] an incentive for a parent to remove or retain a child in the hope that the child will quickly acclimatize and not be returned." *Karkkainen*, 445 F.3d at 295–96; *see also Mozes v. Mozes*, 239 F.3d 1067, 1097 (9th Cir. 2001) ("The greater the ease with which habitual residence

---

[18] The Supreme Court noted that these facts include "a change in geography combined with the passage of an appreciable period of time," "age of the child," "immigration status of child and parent," "academic activities," "social engagements," "participation in sports programs and excursions," "meaningful connections with the people and places in the child's new country," "language proficiency," and "location of personal belongings." *Monasky*, 140 S. Ct. at 727 n.3 (quoting Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 (2d ed. 2015)).

may be shifted without the consent of both parents, the greater the incentive to try."), *abrogated on other grounds by Monasky*, 140 S. Ct. at 719. Finding acclimatization could occur over a few-week vacation would reward improper retention and undermine the Hague Convention's purpose.

### 3.    Petitioner's Custody Rights

Respondent does not appear to contest either the third or fourth elements of Petitioner's *prima facie* case, relating to Petitioner's custody rights under Irish law. The Court, therefore, addresses them only briefly.

Petitioner must show that retention of C.M. in the United States breached Petitioner's custody rights under Irish law, and that Petitioner was exercising his custody rights at the time of removal. "[T]he test for finding the non-exercise of custody rights under the Hague Convention is stringent." *Baxter*, 423 F.3d at 368. The Third Circuit explained:

> The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find "exercise" whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child. . . . [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.

*Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1065–66 (6th Cir. 1996)).

Here, the analysis on the third and fourth elements is straightforward, without any complicating facts. C.M. is Petitioner's biological son, born from the marriage of Petitioner to C.M.'s biological mother. C.M. was born in Ireland, has solely Irish citizenship, and has lived with Petitioner in Ireland for the entirety of C.M.'s life. No Irish court has entered an order altering Petitioner's parental rights. (Stip. ¶¶ 14–15.) Even assuming, as Respondent alleges, that Petitioner did not earn income to support the family, contribute to household chores, or help homeschool the

children, this is insufficient to undermine the existence and exercise of Petitioner's custody rights under Irish law.

Having concluded that Petitioner established his *prima facie* case for return, the Court turns to Respondent's two asserted affirmative defenses, which, if established, grant the Court discretion to order C.M. not be returned to Ireland.

### B.   "GRAVE RISK" OF HARM EXCEPTION

One affirmative defense to a child's return is the "grave risk of harm" exception. To meet this exception, the respondent must establish by clear and convincing evidence that "[t]here is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Golan v. Saada*, 142 S. Ct. 1880, 1888 (2022) (quoting Hague Convention, art. 13(b)). "For the grave harm exception to apply, the respondent must cite specific evidence of potential harm to the child upon his return." *Baxter*, 423 F.3d at 374. The exception applies to both the risk of "physical" as well as "psychological" harm. *Id.* at 373 n.6.

The Third Circuit has offered examples of the degree of risk required to trigger the exception, including "cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Id.* at 373 (quoting *Friedrich*, 78 F.3d at 1069). The Third Circuit has approvingly quoted the Second Circuit's characterization of the exception:

> At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Id.* (quoting *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001)). Courts finding a grave risk of harm look for evidence that alleged abuse does not constitute "isolated or sporadic incidents." *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007).

Respondent argues that "Petitioner's regular abuse of Respondent placed C.M. at risk of harm." (Resp. Br. at 36–37.) Respondent contends that a grave risk of C.M.'s harm can be established through a "grave risk of domestic violence" to Respondent herself. (*Id.* at 38.) Respondent's expert Dr. Montgomery, opined that there was a "grave risk" that C.M. would "be exposed to both physical and psychological harm were he to return to Ireland." (Tr. at 258:16–259:4; Ex. R-1 at 27.) Although Respondent's argument appears to focus solely on psychological harm to C.M. from allegedly viewing Respondent's abuse, the Court briefly addresses the possibility of physical harm to C.M. because Dr. Montgomery argued that return to Ireland would place C.M. in physical danger, and C.M. told Dr. Lane that Petitioner abused him by "slapp[ing], punch[ing], and shak[ing]" him. (Ex. P-12 at 19.)

### 1.    Grave Risk of Physical Harm

There is no evidence that C.M. would be subjected to a grave risk of physical harm should he return to Ireland.

There is scant evidence that Petitioner physically abused C.M. in Ireland. Dr. Montgomery summarized that in her interviews, C.M. said he "was frequently slapped on the legs, violently shaken, and threatened repeatedly." (Ex. R-1 at 14.) The Court finds that Dr. Montgomery's characterizations of her interview with C.M. are undermined by the absence of any details or corroborations for any of the generalized incidents described in her report or testimony. C.M. reported similar behavior to Dr. Lane, who found that his claims of physical abuse showed signs of undue influence based on C.M. "repeatedly us[ing] the same words and phrases to describe his

father's behavior toward himself and his mother, including hit, slap, and yell." (Ex. P-12 at 19.) When the Court interviewed C.M., he did not mention any instances of physical abuse or assaults. Petitioner's father and sister also denied witnessing any physical abuse. (M. McElligott Test., Tr. at 111:23–112:20; McCabe Test., Tr. at 134:18–135:5.) The Court also heard from Petitioner himself and found his denial of any physical abuse credible. Additionally, any claim of physical danger to C.M. is undercut by Respondent returning J.M. to Petitioner. If Petitioner truly posed a "grave risk" to twelve-year-old C.M., a parent would be unlikely to send ten-year-old J.M. — even accounting for differences between the children's relationship with Petitioner — back to the alleged abuser.

On the stand, Petitioner candidly admitted to verbally, and occasionally physically, disciplining C.M. (S. McElligott Test., Tr. at 212:10–214:4.) However, he noted that this discipline rarely occurred; was primarily verbal rather than physical; was administered by and with the agreement of both parents; and when physical, never involved the use of any objects. (*Id.*) Asked to elaborate, Petitioner testified that the physical discipline involved "a light smacking on the bottom" or that Petitioner might "grab [C.M.] by the scruff of the neck." (*Id.* at 213:6–13.)

While the Court is not endorsing such means of parental discipline, this behavior does not evidence the level of repeated history of serious physical or emotional abuse to C.M. that establishes a grave risk of physical harm to a child should he return. *See, e.g., Souratgar v. Lee*, 720 F.3d 96, 104 (2d Cir. 2013) ("Sporadic or isolated incidents of physical discipline directed at the child . . . have not been found to constitute a grave risk."); *Foster v. Foster*, 654 F. Supp. 2d 348, 361 (W.D. Pa. 2009) (finding that "spankings, name-calling and physical discipline" administered by the "domineering, excessively demanding and impatient" petitioner were insufficient to establish a grave risk of harm); *McManus v. McManus*, 354 F. Supp. 2d 62, 69–70

(D. Mass. 2005) (finding no grave risk of harm despite that "the children had grown troubled and fearful from the chaotic conditions and physical discipline to which they were subjected" by petitioner).

### 2. Grave Risk of Psychological Harm

Nor does the Court finds clear and convincing evidence that Petitioner's alleged abuse of C.M.'s mother, Respondent, creates a grave risk of psychological harm to C.M. should he return to Ireland.

There are several ways in which abuse of a parent might create a grave risk of harm to the child. One is if abuse of the parent suggests that the child may be subjected to the same abuse upon return. *See Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000) ("[C]redible social science literature establishes that serial spousal abusers are also likely to be child abusers."). Another is if abuse of the parent will psychologically traumatize the child upon his return, in the event that the abuse of the respondent parent continues. *Id.* ("[C]hildren are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser."). Respondent appears to argue only the latter. (Resp. Br. at 36–40.)

Courts finding the grave risk of harm affirmative defense met often cite both severe physical and emotional abuse. For example, in one case Respondent cites, the First Circuit found that the district court had erred in not finding a grave risk of "physical and psychological harm" to the children given petitioner's "pattern of violence, including violence directed at his own children." *Walsh*, 221 F.3d at 219. The appellate court noted the "ample evidence that [petitioner] has been and can be extremely violent and that he cannot control his temper. There is a clear and long history of spousal abuse, and of fights with and threats against persons other than his wife. These include [petitioner's] threat to kill his neighbor . . . for which he was criminally charged,

and his fight with his son . . . ." *Id.* at 219–20; *see also Ermini v. Vittori*, 758 F.3d 153, 157 (2d Cir. 2014) (affirming finding of grave risk of harm based on trial court's finding that petitioner "had hit [respondent] at least ten times during the course of their relationship, and was in the habit of striking the children" (citation omitted)).[19]

The evidence before the Court does not indicate the high level of abuse courts look for under this exception. During the Court's *in camera* interview with C.M., C.M. mentioned no example of physical abuse by his parents, let alone suggestion that the alleged abuse to his mother psychologically scarred him to the extent that his return would pose a grave risk of psychological harm. C.M. acknowledged the same to the parties' experts, telling Dr. Montgomery "that he never saw his father strike his mother." (Ex. R-1 at 14.) To Petitioner's expert, C.M. initially stated that his father "hit or slapped" his mother but then acknowledged "I don't know if he hit Mom. I never saw that. I won't say it didn't happen, but I never saw that." (Ex. P-12 at 26.) The Court would expect a twelve-year-old child, who, as explained below, the Court finds is mature enough to have his views taken into consideration, to cite specific instances of alleged abuse, the approximate time period of those alleged instances, and how the abuse he alleged affected him to the Court and especially to the parties' experts.

Respondent also offers no corroboration in the form of substantiated charges, repeated intervention by law enforcement, reports by any third-parties or neighbors, or photographic or

---

[19] *See also Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (reversing district court finding there was no grave risk of harm because of the petitioner's threat to kill his wife and their children "given [petitioner's] propensity for violence, and the grotesque disregard for the children's welfare that he displayed by beating his wife severely and repeatedly in their presence and hurling obscene epithets at her also in their presence"); *Miltiadous v. Tetervak*, 686 F. Supp. 2d 544, 554 (E.D. Pa. 2010) (finding exception met with evidence that petitioner "beat [respondent] repeatedly and, at one point, broke her nose[,] . . . would drink heavily and become enraged[, and] . . . kept a gun in the house and threatened to kill [respondent]").

medical reports. In many cases in which grave risk of harm to a child is found based on spousal abuse, courts cite a history of documented abuse. *See Walsh*, 221 F.3d at 209–11 (describing history of respondent's medical treatment as a result of petitioner's physical abuse and restraining orders entered against petitioner, which he violated); *Ermini*, 758 F.3d at 158 (noting respondent had restraining order against petitioner, and petitioner had been criminally charged over his domestic abuse); *J.C.C. v. L.C.*, No. 19-21889, 2020 WL 6375789, at *4 (D.N.J. Oct. 30, 2020), *aff'd*, No. 20-3289, 2022 WL 985873 (3d Cir. Mar. 31, 2022) (rejecting grave risk defense because respondent "has not entered into evidence any police reports, contemporaneous medical reports, or eyewitness testimony to corroborate the alleged physical abuse . . .").[20]

The one incident of alleged abuse in which Respondent called the Irish police involved Petitioner throwing a set of headphones when he was angry. Petitioner testified that he was "disturbed" and "annoyed" at passersby on the street and threw his headphones at the ground, which then bounced up and "brushed' [Respondent's] leg." (S. McElligott Test., Tr. at 153:20–157:4.) Petitioner also testified that Respondent told him she called the police on the advice of her father, which Mr. Mocco confirmed during his testimony. (S. McElligott Test., Tr. at 155:18–25; P. Mocco Test., Tr. at 413:8–414:4.) After an officer came to the home, Respondent declined to press charges. (S. McElligott Test., Tr. at 156:18–19.) While not countenancing such behavior, the Court is not convinced that this one example of aggression toward Respondent could make out the grave risk of harm exception.

---

[20] The Court is sensitive to the ample social science explaining why domestic violence survivors may not report abuse. However, absent any example of Respondent *contemporaneously* reporting abuse — either to a medical provider, the Irish authorities, or a family member — the Court is left with only the Respondent's allegations of abuse first made *after* she had wrongfully removed C.M. to the United States. Given Respondent's heavy burden here and the unique nature of Hague Convention proceedings, the Court does not find Respondent's post-removal allegations of abuse sufficient to meet her burden to prove spousal abuse so severe that there is a grave risk of psychological harm to C.M. if he returned.

In fact, the case Respondent relies on most heavily illustrates, in the Court's view, the significant level of abuse to a respondent spouse necessary to establish a grave risk of psychological harm to the child. *See Baran v. Beaty*, 526 F.3d 1340 (11th Cir. 2008). In *Baram*, the abusive spouse "dr[ank] heavily, becoming intoxicated [] almost daily." *Id.* at 1342. He was "violent and unstable" and would "berate[]," physically "intimidate[]," and "physically abus[e]" his wife." *Id.* The trial court noted that the petitioner "slapped [the respondent] so hard she fell to the ground" and on another occasion "pinned her between a door and the wall, pushing on the door in a manner that applied intense pressure to her [pregnant] abdomen." *Id.* The abusive spouse shouted repeated, specific, and violent threats to the respondent. *Id.* at 1342–43. The respondent introduced evidence from a prior divorce proceeding with the petitioner's ex-wife documenting specific, repeated incidents of violence against her as well. *Id.* at 1344. The *Baran* petitioner also offered no evidence rebutting the respondent's ample evidence of abuse, instead relying on a threadbare denial in his petition. *Id.* at 1345. In contrast here, the Court had the opportunity to speak with C.M. directly, and took testimony from Petitioner and his family members who knew Respondent and Petitioner in Ireland, which rebutted Respondent's general claims of abuse. The general allegations of abuse, combined with only one specific instance of Petitioner throwing headphones to the ground, do not rise to this level.

Even assuming *arguendo* that Petitioner abused Respondent in front of C.M., Respondent offers insufficient evidence of the effect of the alleged abuse on C.M. in the event he returned to Ireland. As the Second Circuit has noted, the relevant inquiry is not "whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm." *Souratgar*, 720 F.3d at 104 (citing *Charalambous v. Charalambous*, 627 F.3d 462, 468 (1st Cir. 2010)). Courts asked to apply this exception based

on expected psychological trauma to the child look for specific testimony of expected harm. *See, e.g.*, *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 408 (E.D.N.Y. 2005) (denying return because of "abject physical abuse" to the children and because return would trigger "relapse" of their "post-traumatic stress disorders and the likelihood that [one child] would be suicidal"); *Espinosa-Cisneros v. Solis-Lopez*, No. 16-57, 2017 WL 1025175, at *1 (D. Nev. Mar. 16, 2017) (child diagnosed with post-traumatic stress disorder); *Walsh*, 221 F.3d at 211 (same); *cf. Valles Rubio v. Veintimilla Castro*, No. 19-2524, 2019 WL 5189011, at *24 (E.D.N.Y. Oct. 15, 2019), aff'd, 813 F. App'x 619 (2d Cir. 2020) ("There is no evidence in the record that [the child] has been diagnosed with post-traumatic stress disorder . . . ."); *Rodriguez v. Rodriguez*, 33 F. Supp. 2d 456, 461 (D. Md. 1999) (noting that an expert "opined that both [children], as well as their mother, suffer from [PTSD] as a result of Petitioner's conduct"). Here, Respondent's sole evidence of any secondhand effect of Petitioner's alleged abuse on C.M. consists of a questionnaire administered by Respondent's expert witness. (Montgomery Test., Tr. at 267:1–268:12.)[21]

C.M.'s parents' relationship was marred by repeated examples of mutual unkindness and verbal cruelty. Petitioner, supposedly supported and joined by Respondent, also employs discipline that might be out of step with parenting norms in the United States. While the Court does not endorse Petitioner's behavior that Respondent alleges, the allegations here do not overcome the Convention's presumptive mandatory return. The sporadic and very general examples of physical discipline and verbal unkindness before the Court do not rise to the level of domestic violence that creates a grave risk of psychological harm to C.M. if he were to return to Ireland. To the extent

---

[21] Dr. Montgomery also testified that C.M.'s therapist, Dr. Ostrowski, told Dr. Montgomery "that [Dr. Ostrowski] was treating [C.M.] for trauma and doing trauma-focused therapy," from which Dr. Montgomery "assum[ed] [C.M.] was traumatized . . . ." (*Id.* at 274:1–17.) However, C.M. told the Court that it was Respondent's idea that he go to therapy and that he did not like therapy because he did not find it helpful. (C.M. Tr. at 24:7–25:8.) Thus, Dr. Montgomery's assumption does not connect Petitioner's alleged abuse to a grave risk of harm to C.M. should he return.

any behavior, not before the Court, crops up that creates genuine danger to C.M. or Respondent, the Irish courts and justice system may address those concerns.[22]

### C.    WISHES OF THE CHILD DEFENSE

A second exception Respondent may establish by a preponderance of the evidence is the "wishes of the child" affirmative defense. The Court may refuse to order the child's return "if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Tsai-Yi Yang*, 499 F.3d at 278 (quoting Hague Convention, art. 13). The respondent bears the burden to prove the defense by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). As part of this defense, the Court also "consider[s] whether a child's desire to remain or return to a place is the product of undue influence, in which case the child's wishes should not be considered." *Id.* (quotations and citations omitted); *De La Vera v. Holguin*, No. 14-4372, 2014 WL 4979854, at *11 (D.N.J. Oct. 3, 2014) (finding the exception was not met).

When a respondent establishes this exception, the "child's wishes can be the sole reason that a court refuses to order the return of the child to his or her habitual residence." *Tsai-Yi Yang*, 499 F.3d at 278 (citing *Blondin*, 189 F.3d at 247). However, the Third Circuit has cautioned that the Court "'must apply a stricter standard in considering a child's wishes when those wishes are the sole reason underlying a repatriation decision and not part of some broader analysis,' such as

---

[22] Respondent contends that she does not need to establish that Irish courts are capable of ameliorating the effects of abuse in order to meet this exception. (Resp. Br. at 39.) While true, the Supreme Court recently instructed in *Golan* that the Court nonetheless "ordinarily should address ameliorative measures raised by the parties or obviously suggested by the circumstances of the case . . . ." 142 S. Ct. at 1893. The Court finds that the marital turmoil Respondent complains of could be addressed by the Irish courts. This does not improperly enlarge Respondent's burden but rather draws a distinction between "grave risks established by clear and convincing evidence" and "potential risks that are less than grave but bear watching." *Seaman v. Peterson*, 766 F.3d 1252, 1262 (11th Cir. 2014).

whether the child would suffer a grave risk of harm if returned to his or her habitual residence." *Id.* at 278–79 (quoting *de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007)).

The Court notes there are many cases in which District Courts have considered the "wishes of the child" defense and reached opposite conclusions. The parties cite the Court to many of these divergent decisions. "Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." *Tsai-Yi Yang*, 499 F.3d at 279 (quoting *de Silva*, 481 F.3d at 1287)). Thus, the Court evaluates the case before it in light of the text and purpose of the Hague Convention, guided by the numerous Third Circuit cases to have considered this exception, so as to issue an informed decision based on the specific, unique facts presented.

### 1. C.M.'s Maturity and Particularized Objections

The "[Hague] Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis." *Tsai-Yi Yang*, 499 F.3d at 279. With respect to the second element, the Court considers whether the child expresses "particularized objections" to returning or simply a "generalized desire" to remain in the United States as may be expected of a child of a comparable age moving to a new country. *Id.*

Both parties' experts testified that C.M. is sufficiently mature for the Court to take his views into consideration. (Montgomery Test., Tr. at 258:6–12; Lane Test., Tr. at 27:14–21.) Both experts also agreed that C.M. expressed particularized objections against returning to Ireland. (Montgomery Test., Tr. at 258:20–259:1, 294:17–295:9; Lane Test., Tr. at 29:23–30.)[23] Indeed,

---

[23] Dr. Lane opined that C.M. was sufficiently mature for the Court to take his views into consideration. (Ex. P-12 at 14–18.) Dr. Lane also concluded that C.M. offered specific reasons against returning to Ireland. (*Id.* at 18–21.) Dr. Lane relayed C.M.'s reported "primary objection" to returning was based on his perceived greater educational opportunities in the United States compared to Ireland. (*Id.* at 18.) Dr. Lane also recited the other reasons C.M. gave, including "repeated[] state[ments] that his father abused him in Ireland," C.M.'s "lack of freedom" in Ireland, and his limited socialization that resulted in him having "one or two

when questioned by the Court at the close of the two-day proceedings, the parties agreed that these two elements of the wishes of the child defense are met in this case. (Tr. at 512:13–513:1.)

The Court agrees with the parties that the first two elements of the affirmative defense are met here. The Court had the opportunity to interview C.M. directly, during which C.M. presented as an intelligent, thoughtful young man. The Court also heard testimony from the experts who interviewed C.M. During each interview, C.M. displayed a clear grasp of the nature of the proceedings, the significance of the interviews, and how the answers he gave could affect the Court's decision where he would live. C.M. explained to the Court that his awareness flowed from these proceedings being the "main subject for the last, like, six months" at his grandparents' home. (C.M. Tr. at 8:6–9.) C.M.'s awareness of the proceedings and the parties' relative financial positions was evident from his comment to Dr. Lane during their interview that his father's *pro bono* attorney was "[l]ike a freebie, a student that is just going to work for experience, a student from Camden." (Ex. P-12 at 25.) It is clear to the Court that C.M. attained the requisite "age and degree of maturity" that ordinarily would be appropriate to consider his views with regard to his preferred country of residence.

The Court also finds that C.M.'s reasons for preferring to remain in the United States were specific and worth considering. The experts disagreed over C.M.'s main objection to returning to Ireland. C.M. told Dr. Lane his "primary objection" to returning was the better educational opportunities in the United States. (Ex. P-12 at 18.) For Dr. Montgomery, "top of the list" for C.M. opposing return was the "abusive and neglectful" home environment in Ireland. (Montgomery Tr., 294:17–23; *see also* Ex. P-12 at 19.) C.M. also talked to the experts about his "lack of freedom"

---

friends" he said were "not really friends." (*Id.* at 19–20.) C.M. also told Dr. Lane that there was "chaos" at his home in Ireland, that he has a "lack of family" in Ireland, and that his mother's health has improved since coming to the United States. (*Id.* at 20–21.)

in Ireland that limited his ability to leave the house and socialize with children his age. (Ex. P-12 at 19–20; Montgomery Test., Tr. at 294:17–23 ("The whole homeschooling, the isolation, no activities, no community, that he just couldn't see himself going back to that environment, ever.").) C.M. also talked about how much he enjoyed his grandparents' home in Bernardsville, comparing it to the "chaos" of his home in Ireland. (Ex. P-12 at 19–21.) C.M. told the Court about his mother's health in Ireland compared to her health in the United States, and how he wished to remain so her health will continue to improve. (*Id.* at 21.)[24]

Based on its own conversation with C.M. and the experts' multiple interviews with C.M., the Court finds that C.M. has offered rational and particularized reasons for opposing return, beyond a mere "generalized desire" to remain where he is. *Yang*, 499 F.3d at 279.

### 2.     Undue Influence

In *Tsai-Yi Yang*, the Third Circuit, in its first opportunity to consider a case in which the "wishes of the child" defense was raised, affirmed the district court's order returning a child to her country of habitual residence. 499 F.3d at 280. After hearing from the child *in camera* and from an expert psychologist, the district court determined that the "attachment that [the child] had to Pittsburgh and her family there were created because of [the respondent's] wrongful retention of [the child]." *Id.* Critically, it was "the passage of time during the years of wrongful retention and litigation of this case that created [the child's] desire to remain in Pittsburgh." *Id.* In affirming the result, the Third Circuit warned that:

---

[24] The Court notes that it relies primarily on its own interview with C.M., supplemented by that of the experts, to determine C.M.'s objections to returning. C.M.'s objections to return, as relayed through Respondent and her father, were equivocal. When Respondent's counsel asked her whether C.M. ever expressed opposition to returning to Ireland, Respondent equivocated: "Yeah. Yeah, as far as I can remember, yeah." (Tr. at 502:20–25.) When asked whether she "t[old] [C.M.] whether he should return to Ireland or not," Respondent similarly responded: "No, I don't think so." (*Id.*) Similarly, C.M.'s maternal grandfather testified that C.M. opposed return but noted that this was based on his "unwritten sense" that C.M.'s "sense of place is here in Bernardsville." (Tr. at 434:25–436:5.)

> If the District Court applied the exception in this case, it would encourage parents to wrongfully retain a child for as long as possible. A lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings, which may create a desire to remain in his or her new home. The application of the exception in this case would reward [the respondent] for violating [the petitioner's] custody rights, and defeat the purposes of the Convention.

*Id.* The Third Circuit concluded that "[e]ven if the record supported a finding that [the respondent] met his burden of proving the applicability of the exception to this case, it cannot be said that the District Court abused its discretion by refusing to apply the exception." *Id.*

The Court's discretion on this defense is "especially important because of the potential for brainwashing of the child by the alleged abductor. A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." *Tsai-Yi Yang v. Fu-Chiang Tsui*, No. 03-1613, 2006 WL 2466095, at *17 (W.D. Pa. Aug. 25, 2006), aff'd, 499 F.3d 259 (3d Cir. 2007) (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10510 (1986)).

The Court finds, without question, that C.M.'s desire to remain in the United States and not return to Ireland is the product of undue influence. The Court finds that the child's wrongful detention in New Jersey for what now is approaching a year among his mother and her close-knit family, all of whom view Petitioner very negatively and apparently have no hesitation in expressing same in front of C.M. — coupled with the welcome American accoutrements such as summer camps, cellphones, and private gyms that were not afforded to him in Ireland — have understandably but improperly contributed to his desire to remain here.

The Court's *in camera* interview with C.M. made clear that C.M. blames his father for all aspects of his life in Ireland that C.M. disliked. For example, C.M. told the Court that he did not

enjoy being homeschooled, that his homeschooling was basically nonexistent, and that the only reason he did not attend public school was because Petitioner was "heavily against the idea." (C.M. Tr. at 25:17–23.) C.M. strenuously objected to his religious upbringing and attributed such religiosity only to his father. (*Id.* at 16:15–21.) He blamed his lack of friends in Ireland on his homeschooling and his perception that his father would not allow him outside. (*Id.* at 11:6–11, 23:12–21.) C.M. also reported that Petitioner would yell at him. (*Id.* at 26:13–17). C.M.'s complaints to the Court about his life in Ireland are similar to those he relayed in his interviews with each party's expert. (Lane Test., Tr. at 37:15–38:7; Montgomery Test., Tr. at 258:19–259:1.)

Despite C.M. laying blame for these aspects of his life in Ireland solely on his father, the Court heard ample evidence that *both* parents were responsible for these child-rearing decisions. With respect to C.M.'s education, Petitioner and his sister credibly testified that the parents jointly decided to homeschool their children. (S. McElligott Test., Tr. at 151:15–152:11; McCabe Test., Tr. at 143:4–13.) Likewise with respect to C.M.'s religious upbringing, Respondent's own expert, Dr. Montgomery, testified that the parties' commitment to religion was a "mutual draw" at the start of their relationship. (Tr. at 279:278:8–279:15.) Respondent was given an opportunity to testify on these and other relevant issues that bear on this matter but demurred.

The Court finds that C.M.'s unbalanced view of his parents' role in his upbringing results from the undue influence of the past nine months living with his mother and her family. *See de Jesus Joya Rubio v. Alvarez*, 526 F. Supp. 3d 1186, 1207 (S.D. Fla. 2021) (finding no undue influence where child held balanced views of each parent, and neither parent disparaged the other in his presence). Dr. Lane concluded that C.M. "provided a black and white, polarized opinion of his father depicting him in a negative light and only making disparaging remarks about him." (Ex. P-12 at 26.) To Dr. Lane as well as the Court, C.M.'s inability to express as "nuanced perspective

of his father and alignment with his mother and his grandparents, indicates undue influence." (Ex. P-12 at 26; Lane Test., Tr. at 38:12–22 ("[A] polarized opinion of his father that was very concrete, did not allow for any moments of redemption for his father or positive qualities, suggests to me that he was unduly influenced by his mother, potentially his maternal grandparents to speak negatively about his father.").)[25] The Court agrees.

The Court also finds undue influence in the evident warping of C.M.'s recollection of his life in Ireland. C.M. cites the abundant family he visits with in New Jersey and the fact that he never saw family in Ireland. (Ex. P-12 at 21.) But C.M. himself told the Court that he saw his Irish grandparents "quite often" when visiting their home, celebrating holidays, or watching television and relaxing together. (C.M. Tr. at 14:14–16:6.) C.M.'s assertion that he "wasn't really allowed outside most of the time" (C.M. Tr. at 10:19–11:11) was undercut by the credible testimony the Court heard from Petitioner and his family that prior to C.M.'s abduction, C.M. would play with his brother, father, and family. (M. McElligott Test., Tr. at 125:15–19; S. McElligott Test., Tr. at 158:10–159:10.) This skewed view is most likely the byproduct of C.M.'s mother's influence, as well as that of her family here in the United States.

C.M.'s tone, body language, and unprompted answers condemning his father and the spartan Irish lifestyle for which C.M. blames his father — C.M.'s claimed lack of friends, structured upbringing, mandated religiosity, homeschooling, and lack of cellphone — struck the Court as deeply influenced by outside forces. *See Babcock v. Babcock*, 503 F. Supp. 3d 862, 881

---

[25] Dr. Lane agreed that certain of C.M.'s individual objections to returning to Ireland were not the product of undue influence, such as his statements that he enjoyed school (Tr. at 64:22–65:3), his specific favorite school subjects (*id.* at 65:4–8), and his academic interests (*id.* at 65:9–16). However, the Court finds that Respondent's attempts to carve out certain of C.M.'s feelings towards New Jersey, which may well have been genuinely held, fail to establish that C.M.'s overarching reason against returning was not unduly influenced. In short, the Court finds that the adults' conduct, intentional or not, so pervasively infected C.M.'s stated reasons for remaining so as to undermine the validity of his reasoning.

(S.D. Iowa 2020) (finding undue influence because during interview child "appear[ed] to have been coached" and "methodically covered the points of Defendant's arguments to why the child should remain [in the United States]"); *In re Robinson*, 983 F. Supp. 1339, 1343–44 (D. Colo. 1997) (finding undue influence based on child's use of the word "settled" — a key legal term to defense — in his interview). For example, several times, C.M. responded to the Court's straightforward questions with unsolicited, contemptuous answers pointing out perceived flaws in his father beyond the normal awareness of a mature twelve-year-old child. Most tellingly, in response to a simple and straightforward question as to whether his father worked out of the home which asked for only a yes or no answer, unprompted, the boy expounded in a most revealing manner. With palpable contempt, C.M. offered that his father worked at a series of companies but only briefly, and that his father took monthly financial handouts from his American grandparents whom he, C.M.'s father, wanted nothing to do with. C.M.'s disdain took on a mocking tone, when again, unprompted, he added: "he didn't want anything to do with them, but he was happy to take 2,000 [Euros] a month." (C.M. Tr. at 12:12–25.)[26]

C.M.'s sensitivity to Respondent's litigation position was also evident in how he discussed his mother's condition. In the Court's *in camera* interview, C.M. stated he barely got an education because his mother was not able to really teach him due to her debilitating migraines. C.M. first stated that his mother suffers from headaches but immediately corrected himself, attempting to make it appear that her migraines were a byproduct of her life in Ireland and thus in the past tense: "Well, my Mom, see she *gets* – she *used to get* migraines very, very often in Ireland . . . ." (*Id.* at 13:8–9 (emphasis added).) He gratuitously offered that in Ireland she looked like a "husk," which

---

[26] It actually appears that C.M. doubled the amount of money the Moccos subsidized Respondent with monthly, (Ex. R-1 at 7, 22), indicating that C.M. was told an inflated amount, obviously by an adult.

he explained as "just like an outer shell, there's nothing inside of it." (*Id.* at 13:11–20.) The Court was struck with the uncommon verbiage as to the use of the word "husk" by a twelve-year-old boy.

C.M.'s paternal disdain is unsurprising, as it reflects the contempt in which Respondent and her family hold Petitioner, which was obvious from multiple sources of evidence adduced at trial. This Court also notes that Respondent and Petitioner come from diametrically different backgrounds. Respondent was born to high-achieving, wealthy, well-educated parents, grew up in a nine-bedroom home set on twenty acres in New Jersey, and was one of seven siblings, all of whom received some level of higher education. Petitioner, on the other hand, is Irish, modestly educated, dependent exclusively on government welfare for his income, and devoutly religious. Respondent's parents have evidently always disapproved of their daughter's relationship with Petitioner, and perhaps understandably so, knowing the divergent lives and lifestyles of their daughter and Petitioner. As Dr. Montgomery testified about Petitioner's relationship with his in-laws:

> There was a dislike. It's hard to know where that divide occurred. But even before they were married, I believe [Respondent's] father was not particularly supportive of the relationship. And I think that, you know, [Petitioner] also had an adverse reaction to [Respondent's father]. It was just a bad fit.

(Tr. at 280:25–281:8.)[27]

Dr. Lane opined that C.M. picked up on this disdain and that his objections to return clearly reflect it. Dr. Lane noted that C.M. displayed a "collective mentality" at several points of their

---

[27] Evidently, the dislike was mutual. Petitioner does not like Respondent's family and suspected that they were pressuring or clearly facilitating Respondent to keep C.M. and J.M. in the United States after they arrived. Petitioner also expressed fear that Respondent's family were pushing Respondent to make the appointments for the children. (*Id.* at 56 ("You go into them bullies and tell them to cancel all those appointments and that those kids are going home M[onday].")); *id.* at 55 ("Please Audrey come home. Don't deprive your sons of a father and family unit. Snap out of it and come home Monday.")).

conversation. (Ex. P-12 at 22; Lane Test., Tr. at 31:21–32:12.) Dr. Lane found that this "group think" pervaded C.M.'s perception of Petitioner. (Ex. P-12 at 22; Lane Test., Tr. at 34:14–18.) C.M. repeatedly told Dr. Lane about "being exposed to material and conversations that are adult matters," such as that his mother gave his father money because "[his father] is unemployed and lazy." (Ex. P-12 at 23.) C.M. used terms in his interview with Dr. Lane that were not age appropriate and "that he would be unaware of without an adult informing him." (*Id.* at 24.) For example, C.M. talked about Petitioner calling "DYFS." The term "DYFS" — which stands for the Division of Youth and Family Services — is an outdated, New Jersey-specific name for New Jersey's former child protection agency. C.M., a child who was born the year before DYFS's name was changed to the Division of Child Protection and Permanency ("DCP&P") and was raised in a different country, could not have known about DYFS short of "an adult without current knowledge of the [child protective] system" telling him. (Ex. P-12 at 24.)[28]

In fact, the record in this case is littered with examples of C.M. mirroring his maternal family's dislike of his father, which support's the Court's conclusion here. *See Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 615 (E.D. Va. 2002) (finding undue influence because the thirteen-year-old child was "susceptible to suggestion and manipulation" and "some of his statements regarding reasons for staying in the United States appear[ed] to be the product of suggestion, echoing the preferences of [the respondent]"); *Forcelli v. Smith*, No. 20-699, 2020 WL 5015838, at *10 (D. Minn. Aug. 25, 2020) ("While the Court cannot conclude that [the child] was

---

[28] Dr. Lane's finding that C.M. held a "fixed nature of his [maternal] grandfather's rules" supported her undue influence analysis. (*Id.* at 16.) Dr. Lane noted C.M.'s "acute[] aware[ness]" that his grandfather sets the rules for his home and that he resides in his grandfather's home," (*id.* at 15–16), making it more likely that he would defer to other opinions his grandfather held, such as those about Petitioner. Dr. Lane also found significant that C.M.'s objections to returning to Ireland and descriptions of abuse were "repeated over and over again, in vague language." (*Id.* at 26; Lane Test., Tr. at 31:13–15, 38:1–7.) Dr. Lane contrasted these generalized objections and the "highly specific details" C.M. articulated about his areas of interest. (Ex. P-12 at 16, 25–26.)

coached, the particular idiomatic use of language and similar arguments calls into question whether [her] preference to remain in the United States is her own, or whether it has been cemented by others."). On the stand, Mr. Mocco volunteered his view that Petitioner is a "nut," (Tr. at 444:17–19), and during C.M.'s interview with Dr. Lane, he told her that his whole mother's family "call[s] [Respondent] a nut." (Ex. P-12 at 22.) Mr. Mocco said that C.M. had to be taught that there could not be "chaos" in the house, (Tr. at 420:22–25), and C.M. told Dr. Montgomery that the home in Ireland was "chaos." (Ex. R-1 at 13–14.) Mr. Mocco did not try to mask his disdain for Petitioner's lack of a work ethic. (P. Mocco Test., Tr. at 418:19–21 ("And there was never a thought of Stephen earning any money that could pay for anything involved with the marriage of [sic] those kids.").) Unprompted, C.M. repeated this same thought to the Court in its interview the week before. (C.M. Tr. at 12:9–25 ("So he didn't want anything to do with them, but he was happy to take 2,000 a month.")). Dr. Lane testified that this type of "mirroring" reflects C.M. adopting the views of the family members he has lived with for the past year. (Ex. P-12 at 22.)

The Court notes that this influence, in part, may well have been inadvertent. *See Hirst v. Tiberghien*, 947 F. Supp. 2d 578, 598 (D.S.C. 2013) ("Undue influence may not be intentional, but simply the inevitable product of an ongoing custody battle between two parents."). C.M. acknowledged that the Hague Convention litigation, which he understood would determine where he would live, was "the main subject for the last, like, six months" in his American grandparents' home, where he lived. (C.M. Tr. at 8:6–14; *see also* Ex. P-12 at 24–25 (C.M. told Dr. Lane that he "overheard his grandparents and his mother discussing" the case.).) C.M. also told the Court that he talked about the case with his grandparents and his mother. (C.M. Tr. at 8:6–14, 27:8–12.) Over the course of his time in New Jersey, C.M. absorbed his maternal family's views of this litigation and of his father. However, whether inadvertent or not, the Court concludes that this exposure to

his family's views unduly influenced each of C.M.'s particularized objections to returning. He was aware, in advance of his trip, of the plan that he would remain in the United States, and of the detailed back-up plan if he were forced to return to Ireland.

The Court finds that the undue influence was exacerbated by C.M.'s unwillingness to communicate with his father during his wrongful removal and his change in attitude over time. *See Forcelli*, 2020 WL 5015838, at *11 (declining to apply the wishes of the child exception where child's "affect" towards petitioner became "cold, harsh, and distant" during the period of her removal, which was marked by "somewhat limited communication" between the child and petitioner). C.M. admitted that his limited weekly contacts with his father were usually conducted in the presence of his mother. (C.M. Tr. at 8:6–14, 27:8–12.) Petitioner's and his family's testimony paints a vivid picture of how C.M. changed over the course of his time in the United States. Petitioner testified that C.M. would act "very tough" and "aggressive" and was "obviously not speaking like the [C.M.] that I know or a 12-year-old child." (Tr. at 170:3–13.) Over time, Petitioner also noted that C.M. started making accusations of abuse against Petitioner, which grew "more and more intense" over time. (*Id.* at 170:3–13.) Petitioner also marked the change in C.M. in his contemporaneous emails to his wife. (Ex. P-11 at 10, 15.) Petitioner's family remarked upon an identical change, noting that over time C.M. "wasn't the same little boy." (M. McElligott Test., Tr. at 98:23–100:9.) C.M.'s paternal grandfather and aunt noted that he grew "cheeky," i.e. disrespectful, when speaking with his father. (*Id.* at 98:23–100:9; McCabe Test., Tr. at 133:15–20.) She observed that "[i]t didn't seem like a child that was speaking." (*Id.* at 142:7–17.) She went ever further, noting C.M.'s speech sounded like "adults speaking and you are repeating it." (*Id.* at 142:7–17.)[29]

---

[29] C.M.'s treatment of his brother also morphed over time. C.M. told the Court about the evolution of his relationship with his brother, J.M., younger by two years, stating that it was "[b]rotherly love for the past

The Court's determination is also supported by the expert testimony admitted at trial. The parties in this case presented conflicting expert testimony. Unsurprisingly, Petitioner's expert testified that she found undue influence, while Respondent's expert testified that no undue influence was exerted on C.M. Ultimately, it is the role of the Court, not either party's expert, to make the undue influence determination. *See Tsai-Yi Yang*, 499 F.3d at 279 (affirming district court's finding that wishes of the child defense was not established despite expert witness testimony that "he did not think that [the child] demonstrated any signs of coercion"); *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1216 (3d Cir. 1993) (when the court sits as fact-finder, the court decides between conflicting expert testimony). As explained above in Section I.N, *infra*, the Court found Dr. Lane significantly more credible than Dr. Montgomery. Dr. Lane's testimony provided a nuanced portrait of C.M.'s life in Ireland and the parties' relationship. Dr. Lane acknowledged the messiness of the relationship, C.M.'s maturity, and Petitioner's significant personality flaws, but ultimately concluded that C.M. was unduly influenced by Respondent and Respondent's family.

Dr. Montgomery's testimony, on the other hand, was one-sided, adopting the condemnatory statements of the Respondent witnesses she spoke with and coming across more as a mouthpiece for her client than an impartial expert. Although Dr. Montgomery opined that her interviews with C.M. showed he was "able to provide strengths and weaknesses for both of his parents in a balanced manner," she unpersuasively cited very little in her interview of C.M. that

---

11 years, I guess, and recently for the calls that we have been having since he is now in Ireland with my Dad. The calls [with J.M.] have been getting shorter and shorter." (C.M. Tr. at 9:14–20.) When asked if C.M. missed his younger brother, Mr. Mocco testified: "Oddly enough, I don't believe he misses his brother." (P. Mocco Test., Tr. at 434.) Email communications between the parties also document an incident on April 24, 2023, approximately one month before this Petition was filed, in which C.M. called his younger brother a "[f]ucking pussy" that caused J.M. to "burst into tears" to his father. (Ex. P-11 at 15.) Petitioner wrote to his wife that his "heart is breaking for [C.M.] and our children who were inseparable little boys from youth." (*Id.*)

actually demonstrated any such balanced view. (Ex. R-1 at 27.) Dr. Montgomery also found "little evidence of parental or adult influence" in C.M.'s objections to returning to Ireland, and that "opportunities [in New Jersey] for education, socialization, things that he never had" in Ireland had "blown [C.M.] away." (Tr. at 259:7–19.) However, Dr. Montgomery's conclusion that C.M.'s views were "reality based" and "corroborat[ed] from other sources," (*id.* at 259:7–10), were belied by the overwhelming evidence presented to the contrary. The Court ultimately found Dr. Lane's testimony more reliable and further solidified the Court's determination of undue influence.

The Court also notes the heavy emphasis that Respondent, her parents, and her expert placed on Respondent's evidently remarkable improvement since her arrival in New Jersey. It is clear that throughout her more than thirteen years in Ireland, Respondent did not adequately address her significant and ongoing mental and physical health issues. It is also apparent that Respondent's geographic distance from and infrequent visits with her large, close New Jersey family — compounded by her lack of socialization with other adults in Ireland, due to, in part, her choice to home-school the children — further undermined Respondent's health and general happiness. While Respondent's parents and Dr. Montgomery remarked upon what they viewed as Respondent's significant physical and mental improvement since she arrived in the United States, overseen by a number of physicians and therapists, (Ex. R-1 at 6, 9, 19; P. Mocco Test., Tr. at 435:20–436:5; L. Mocco Test., Tr. at 464:12–22, 466:20–468:16), Respondent's continued fragile state was apparent to the Court. However, whether Respondent received adequate medical care in Ireland, and whether she is healthier in New Jersey, is not before the Court.

The Court finds, without question, that C.M.'s desire to remain in the United States is the product of undue influence. The Court also finds that the child's wrongful detention here for what now is approaching a year, coupled with the welcomed American accoutrements of luxury such as

summer camps, cellphones, and private gyms that were not afforded to him in Ireland, have understandably, but improperly, contributed to C.M.'s desire to remain here. *See Donnelly v. Manion*, No. 13-983, 2013 WL 12315101, at *6 (W.D. Okla. Sept. 26, 2013) (granting petition to return eleven-year-old child to Ireland and finding undue influence because respondent gave child "a puppy, a gaming subscription, and a cell phone" and also "put the child in activities he did not participate in while living in Ireland"). Accordingly, the Court will exercise its discretion under the Convention to find that this is not an appropriate case in which to deny the Petition. C.M. must return to his father and brother in Ireland.

### D. OTHER REQUESTED RELIEF

Petitioner also seeks an award of attorneys' fees and costs pursuant to 28 U.S.C. § 9007. (Pet. ¶¶ 40–41.)[30] At the conclusion of the proceedings, Petitioner's counsel renewed Petitioner's request for attorney's fees in the event the Court granted the Petition, noting that Rutgers Law Associates represents Petitioner *pro bono*. (Tr. at 518:19–519:4.) Pursuant to the Hague Convention and section 11607:

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3). "An award of reasonable fees to a prevailing [Hague Convention] petitioner is thus presumed, unless the respondent can demonstrate that the demanded award would be clearly inappropriate." *Cillikova v. Cillik*, No. 15-2823, 2016 WL 541134, at *3 (D.N.J. Feb. 9,

---

[30] The Petition references 42 U.S.C. § 11607, although that implementing section of the Hague Convention has since been transferred to 22 U.S.C. 9007.

2016); *see, e.g. Distler v. Distler*, 26 F. Supp. 2d 723, 727 (D.N.J. 1998) (applying the Lodestar approach to award reasonable attorney's fees in a Hague Convention case).

Because the parties' pretrial briefing does not address the appropriateness of a fee award, the Court declines to address that requested relief at this juncture. Petitioner is ordered to submit a request for reasonable attorney's fees within fourteen (14) days from the entry of this Opinion and its accompanying Order. Respondent must file opposition to Petitioner's fee application within fourteen (14) days of Petitioner filing his application for attorney's fees.

IV.    **CONCLUSION**

For the reasons set forth herein, and for other good cause shown, the Petition is **GRANTED** and Respondent must return C.M. to Ireland no later than September 22, 2023. Within three (3) days of the entry of this Opinion and its accompanying Order, the parties must meet and confer, and enter a joint status update with the Court. An appropriate order follows.

_____

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: September 12, 2023